118 F.3d 938
 Ernesto MURPHY, Plaintiff-Appellee,
v.
John LYNN, individually and as a Town of Clarkstown Police
Officer, Daniel Weisberg, individually and as a Town of
Clarkstown Police Officer, Town of Clarkstown, Town of
Clarkstown Police Department, and Police Chief William
Collins, Defendants,
John Lynn, individually and as a Town of Clarkstown Police
Officer, Daniel Weisberg, individually and as a
Town of Clarkstown Police Officer,
Defendants-Appellants.
 No. 848, Docket 96-2392.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 22, 1997.
Decided July 8, 1997.
 
 John Nicholas Iannuzzi, New York City (Donald J. Yanella, Iannuzzi & Iannuzzi, New York City, on the brief), for Plaintiff-Appellee.
 Gregg D. Minkin, White Plains, NY (Elizabeth Weiss, Joseph A. Maria, White Plains, NY, on the brief), for Defendants-Appellants.
 Before: KEARSE and JACOBS, Circuit Judges, and GLEESON, District Judge*.
 KEARSE, Circuit Judge:
 
 
 1
 Defendants John Lynn and Daniel Weisberg, who at the pertinent times were police officers in the Town of Clarkstown, New York (the "Town"), appeal from a final judgment entered in the United States District Court for the Southern District of New York following a jury trial before Charles L. Brieant, Judge, ordering them to pay plaintiff Ernesto Murphy $50,000 in damages, plus $89,888.17 in attorneys' fees and expenses, on his claims brought under 42 U.S.C. § 1983 (1994) for malicious prosecution of criminal charges against him. On appeal, Lynn and Weisberg contend principally that they were entitled to judgment as a matter of law on the grounds that Murphy failed to establish (1) that he had suffered a post-arraignment deprivation of a liberty interest protected by the Fourth Amendment, (2) that the criminal proceeding against him had been commenced without probable cause, and (3) that that proceeding had terminated in his favor. Defendants also challenge the award of attorneys' fees. Finding no merit in their contentions, we affirm.
 
 I. BACKGROUND
 
 2
 The events leading to this lawsuit had their beginnings in a traffic stop initiated by Lynn, during which Murphy was given minor traffic citations. The testimony at trial presented sharply conflicting versions of what happened during the stop. Because the jury found in favor of Murphy, and because defendants contend that they were entitled to judgment as a matter of law, we take the evidence in the light most favorable to Murphy, drawing all permissible inferences in his favor and crediting the testimony of his witnesses, as the jury was entitled to do. Viewed in that light, the evidence revealed the following.
 
 A. The Events of November 13, 1989
 
 3
 On the evening of November 13, 1989, Murphy and his girlfriend Mayra Arrendondo, young adults with no history of arrests or of any sort of violent behavior, were driving home in the car of Arrendondo, who had just picked up Murphy at his place of work. Murphy, who was driving, had a restricted driver's license that, without limiting him as to time of day, permitted him to drive a car only to and from work and to accomplish "necessary" tasks. Arrendondo's car was not running smoothly that evening, and in order to prevent it from stalling while stopped at a red light, Murphy caused the engine to idle faster than normal by depressing the gas pedal; when he released the clutch upon the changing of the light, the car lurched slightly. Moments later, on a deserted stretch of road, Murphy was stopped by Lynn.
 
 
 4
 Addressing Murphy and Arrendondo, Lynn quickly became rude and abusive. He asked Murphy questions in rapid-fire style without giving him a chance to answer; as Lynn returned to his police car with Arrendondo's registration and Murphy's license, he referred to Murphy and Arrendondo as "Fuckin' bastards." Some 20-30 minutes later, Lynn issued tickets to Murphy for making an unsafe start and for driving with a restricted license. He also instructed Murphy that he was not to drive this "fuckin' vehicle." As Lynn left the side of Arrendondo's car to return to his police car, and Murphy and Arrendondo were exchanging seats so that Arrendondo could drive, Arrendondo asked Murphy why he had been ticketed. Murphy responded, "It doesn't fuckin' matter. I am going to lose my license anyway."
 
 
 5
 Lynn, overhearing Murphy's response but thinking it was directed at him, asked Murphy what he had said. Though Murphy said he had been responding to Arrendondo, Lynn ordered Murphy to the side of the police car and demanded that he repeat his statement. When Murphy reluctantly did so, Lynn responded by violently grabbing Murphy's shirt, spinning him around, and slamming him against the police car, shouting, "fuckin' black--you black bastard." Lynn kicked Murphy's legs and hit him in the back of the neck. Lynn continued to hit him and appeared to be out of control; Murphy pleaded with Lynn to "[c]alm down" and said he would go with Lynn to the police station but did not want to go with Lynn alone or to be handcuffed. Arrendondo pleaded with Lynn to stop hitting Murphy; she was repeatedly told to "[s]hut the fuck up." Lynn radioed for police backup and then, for a time, did calm down. However, as other officers appeared on the scene, Lynn began to wrestle with Murphy again, and eventually other officers joined in. During the ensuing melee, Murphy was hit and otherwise physically abused by at least three other police officers, among them Weisberg. After the physical struggle ended, Murphy and Arrendondo were arrested and incarcerated overnight.
 
 B. The Criminal Proceeding
 
 6
 On the following day, November 14, 1989, Murphy was arraigned before a town court judge on the basis of accusatory instruments charging him with disorderly conduct and resisting arrest, both misdemeanors, and with two counts of felony assault. The complaints were signed by Lynn and Weisberg. After his arraignment on these charges, Murphy was released on his own recognizance, on the condition that he return to court whenever his presence was required, and he was ordered not to leave the State of New York while the criminal charges were pending. During the ensuing year, Murphy was required to, and did, appear at some eight court hearings.
 
 
 7
 Murphy was offered a plea bargain that would have resulted in the dismissal of all other charges against him if he would plead guilty to a charge of misdemeanor assault; he refused to plead guilty to any charge. In May 1990, the allegations against him were presented to a grand jury, which indicted him on two counts of felony assault in the second degree and on one count of resisting arrest.
 
 
 8
 Under New York's speedy-trial statute, the prosecution was required to be ready for trial within six months after the filing of the first accusatory instrument. See N.Y.Crim. Pro. L. § 30.30 (McKinney 1992). In the summer of 1990, not yet having been tried, and more than six months having elapsed since the November 14, 1989 filing of the complaints against him, Murphy moved in county court for dismissal of the criminal proceeding, contending that his state-law right to a speedy trial had been violated. After an evidentiary hearing at which an assistant district attorney and defense attorneys testified, the court ruled that Murphy's speedy-trial rights had been violated. The court found that more than seven months had elapsed between the filing of the complaints and the prosecutor's declaration of readiness on June 26, 1990. Having heard the witnesses, the court found that at least six months of that time was attributable solely to delay by the prosecution and that there was no excuse for the delay. Accordingly, in December 1990, the court granted Murphy's motion to dismiss the indictment. The dismissal was with prejudice. See N.Y.Crim. Pro. L. §§ 210.20(1)(g), (4) (McKinney 1993).
 
 C. The Present Action
 
 9
 In November 1993, Murphy commenced the present § 1983 action against Lynn and Weisberg, as well as the Town, its police department, and its police chief. The complaint asserted claims of, inter alia, false arrest, use of excessive force during the arrest, and malicious prosecution, in violation of Murphy's rights under the First, Fourth, Fifth, and Fourteenth Amendments to the Constitution. It also alleged that Lynn and Weisberg had committed perjury before the grand jury in order to secure Murphy's indictment.
 
 
 10
 In October 1994, the district court dismissed all of Murphy's claims on the ground that they were barred by the three-year statute of limitations. Murphy appealed, contesting only the dismissal of the § 1983 claims for malicious prosecution. In Murphy v. Lynn, 53 F.3d 547 (2d Cir.1995) ("Murphy I "), this Court reversed the dismissal of the malicious prosecution claims, noting that they had not accrued until the criminal charges against Murphy were dismissed in December 1990 and hence were asserted within the three-year period. See id. at 548. We declined to address defendants' substantive arguments in support of dismissal, noting that further factual development of the record was warranted. See id.
 
 
 11
 Following the remand in Murphy I, a jury trial was held on the claims of malicious prosecution. After the close of evidence, the court dismissed the claims against the Town and the police department, holding that no basis for municipal liability had been shown; it dismissed the claim against the police chief because no evidence had been presented as to his personal involvement in any wrongdoing. Murphy's claims against Lynn and Weisberg were submitted to the jury.
 
 
 12
 The court instructed the jury that, in order to succeed on a malicious prosecution claim under § 1983, Murphy was required to prove (1) "[t]he commencement or the continuance of a criminal proceeding by a defendant against the plaintiff," (2) "the termination of that proceeding in favor of the plaintiff," (3) "the absence of probable cause for the proceeding," (4) "actual malice on the part of the person acting," and (5) "a post-arraignment deprivation of liberty guaranteed by the constitution." However, the court informed the jury that the first element was undisputed and, over defendants' objection, that the second element was established as well:
 
 
 13
 Now, I instruct you that the first two of those elements have been met, because it's clear on this record and apparently not disputed that a criminal proceeding was commenced against Mr. Murphy ... and that that criminal proceeding was subsequently dismissed against him for neglect to prosecute. And you may consider in the absence of any other evidence that the dismissal of the case for neglect to prosecute is a termination of the criminal proceeding in [Murphy's] favor, in the favor of the accused.
 
 
 14
 With regard to the fifth element, i.e., post-arraignment deprivation of liberty, the court instructed as follows:
 
 
 15
 Now, Mr. Murphy has testified that he was not incarcerated at any time after his arraignment, which is on the day following his arrest, and Mr. Murphy claims however that the terms of his release pending trial, recognizance that he signed in lieu of bail and the various court appearances that he was required to make during the months between his arraignment and the time that the action against him was ultimately terminated in his favor, amounted to a deprivation of his liberty.
 
 
 16
 ....
 
 
 17
 You may consider the requirement to appear in court as being a restriction on his liberty, and if you find that he was forbidden from leaving the State of New York, that may be regarded by the jury as significant deprivation of his liberty, even if there is no evidence that he actually would have left the state or intended to leave the state during the period that he was so restricted.
 
 
 18
 The jury returned a verdict for Murphy against Lynn and Weisberg; it awarded Murphy $50,000 in compensatory damages.
 
 
 19
 As discussed in Part II.C. below, Murphy applied for attorneys' fees and expenses under 42 U.S.C. § 1988 (1994) in the amount of $95,621.17. Defendants opposed, contending that reasonable fees and expenses were no more than $10,498.56. The court awarded fees and expenses totaling $89,888.17.
 
 
 20
 Judgment was entered in the total amount of $139,888.17, and this appeal followed.
 
 II. DISCUSSION
 
 21
 On appeal, defendants contend principally that they were entitled to judgment as a matter of law on the grounds that (1) the restriction on Murphy's ability to leave New York and the requirement that he appear in court did not implicate rights under the Fourth Amendment; and (2) a speedy-trial dismissal does not constitute a termination of the criminal proceeding in favor of the accused. Defendants also challenge the jury's finding that the criminal proceeding was commenced without probable cause; and they contend that the award of attorneys' fees was excessive. We are unpersuaded by any of their contentions.
 
 
 22
 A. The Fourth Amendment Basis for Murphy's § 1983 Claims
 
 
 23
 In Albright v. Oliver, 510 U.S. 266, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) ("Albright "), the Supreme Court ruled that a plaintiff who has alleged that a criminal prosecution was initiated against him without probable cause has not stated a § 1983 claim for violation of his right to substantive due process. Rather, in order to prevail on such a claim under § 1983, the plaintiff must show a violation of his rights under the Fourth Amendment. See 510 U.S. at 274-75, 114 S.Ct. at 813-14 (plurality opinion); id. at 281, 114 S.Ct. at 816-17 (Kennedy, J., concurring in the judgment); id. at 288-89, 114 S.Ct. at 820-21 (Souter, J., concurring in the judgment). See also Singer v. Fulton County Sheriff, 63 F.3d 110, 116 (2d Cir.1995) (in order to succeed on a § 1983 claim for malicious prosecution, plaintiff must show conduct that was tortious under state law and that injury was "caused by the deprivation of liberty guaranteed by the Fourth Amendment"), cert. denied, --- U.S. ----, 116 S.Ct. 1676, 134 L.Ed.2d 779 (1996).
 
 
 24
 To the extent pertinent to this case, the Fourth Amendment protects against unreasonable "seizures." It is established that an unreasonable seizure by a state actor in violation of the Fourth Amendment may be pursued in a suit brought under § 1983. See, e.g., Brower v. County of Inyo, 489 U.S. 593, 596, 109 S.Ct. 1378, 1381, 103 L.Ed.2d 628 (1989). Further, since the gist of a claim for malicious prosecution is abuse of the judicial process, a plaintiff pursuing such a claim under § 1983 must show that the seizure resulted from the initiation or pendency of judicial proceedings.
 
 
 25
 Judicial proceedings may begin in any of a number of ways, e.g., by the filing of an indictment, information, or other formal charge, or by an arraignment or a preliminary hearing. See generally Kirby v. Illinois, 406 U.S. 682, 689-90, 92 S.Ct. 1877, 1882-83, 32 L.Ed.2d 411 (1972) (plurality opinion). Under New York law, if there has been no indictment, a criminal action is commenced by the filing of an accusatory instrument, to wit, a "felony complaint" for a felony charge, see N.Y.Crim. Pro. L. §§ 100.05, 100.10(5) (McKinney 1992); id. § 180.10 practice commentaries (McKinney 1993), or a "misdemeanor complaint" or an "information" for a misdemeanor charge, see N.Y.Crim. Pro. L. §§ 100.05, 100.10(1)-(4) (McKinney 1992). See generally People v. Samuels, 49 N.Y.2d 218, 221, 424 N.Y.S.2d 892, 894, 400 N.E.2d 1344 (1980); People v. Blake, 35 N.Y.2d 331, 339-40, 361 N.Y.S.2d 881, 890-91, 320 N.E.2d 625 (1974). However, the filing of a felony complaint serves only to commence the criminal action; in order for a felony prosecution to follow, an indictment must be obtained. See N.Y.Crim. Pro. L. § 100.10(5); id. § 210.05 (McKinney 1993). After the filing of an accusatory instrument, the defendant must be promptly arraigned. See, e.g., People v. Blake, 35 N.Y.2d at 339, 361 N.Y.S.2d at 890, 320 N.E.2d 625. When the accused is physically detained following arraignment, there can be no question that he has been seized within the meaning of the Fourth Amendment. See, e.g., Singer v. Fulton County Sheriff, 63 F.3d at 117 n. 6.
 
 
 26
 In the present case, Murphy was arrested on November 13 without a warrant, and he spent that night in jail. No judicial proceedings preceded Murphy's arrest or detention; and after his arraignment on November 14, following defendants' filing of the accusatory instruments against him, he was not again incarcerated. The question, therefore, is whether the order that Murphy not leave the State of New York or the requirement that he attend court appointments constituted a "seizure" within the meaning of the Fourth Amendment. We conclude that they did.
 
 
 27
 The Supreme Court has long recognized that a citizen's freedom to travel from state to state is a fundamental right that can properly be restricted only in the narrowest of circumstances. See, e.g., Shapiro v. Thompson, 394 U.S. 618, 634, 89 S.Ct. 1322, 1331, 22 L.Ed.2d 600 (1969) (plurality opinion). "[T]he nature of our Federal Union and our constitutional concepts of personal liberty unite to require that all citizens be free to travel throughout the length and breadth of our land...." Id. at 629, 89 S.Ct. at 1328-29. While the constitutional underpinnings of the right to travel "throughout the United States," United States v. Guest, 383 U.S. 745, 758, 86 S.Ct. 1170, 1178, 16 L.Ed.2d 239 (1966), are perhaps not found solely in the Fourth Amendment itself (indeed, its roots have never been identified with particularity, see Attorney General of New York v. Soto-Lopez, 476 U.S. 898, 902-03, 106 S.Ct. 2317, 2320-21, 90 L.Ed.2d 899 (1986) (plurality opinion); Zobel v. Williams, 457 U.S. 55, 60 n. 6, 102 S.Ct. 2309, 2313 n. 6, 72 L.Ed.2d 672 (1981); United States v. Guest, 383 U.S. at 758-59, 86 S.Ct. at 1178-79), the characterization of interstate travel as "a basic right under the Constitution," id. at 758, 86 S.Ct. at 1178, "occup[ying] a position fundamental to the concept of our Federal Union," id. at 757, 86 S.Ct. at 1177-78, is sufficient to demonstrate that restriction of that right as a result of a pending criminal proceeding is a restriction that has Fourth Amendment implications. As the Supreme Court stated in Albright, "deprivations of liberty that go hand in hand with criminal prosecutions" have "Fourth Amendment[ ] relevance." 510 U.S. at 274, 114 S.Ct. at 813 (plurality opinion) (citing Gerstein v. Pugh, 420 U.S. 103, 114, 95 S.Ct. 854, 863-64, 43 L.Ed.2d 54 (1975)).
 
 
 28
 The liberty deprivations regulated by the Fourth Amendment are not limited to physical detention. In Gerstein v. Pugh, which held that "the Fourth Amendment requires a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest," 420 U.S. at 114, 95 S.Ct. at 863, the Court made plain that the liberties protected by that Amendment included the accused's freedom to travel while on pretrial release:
 
 
 29
 Pretrial confinement may imperil the suspect's job, interrupt his source of income, and impair his family relationships.... Even pretrial release may be accompanied by burdensome conditions that effect a significant restraint of liberty. See, e.g., 18 U.S.C. §§ 3146(a)(2)....
 
 
 30
 420 U.S. at 114, 95 S.Ct. at 863 (emphasis added). Section 3146(a)(2), as cited by the Gerstein Court, permitted pretrial release with "restrictions on the travel ... of the person during the period of release." 18 U.S.C. § 3146(a)(2) (1970), revised and recodified at 18 U.S.C. § 3142(c)(1)(B)(iv) (1994) (permitting "restrictions on ... travel"). The Gerstein Court stated that
 
 
 31
 [w]hen the stakes are this high, the detached judgment of a neutral magistrate [that there is probable cause] is essential if the Fourth Amendment is to furnish meaningful protection from unfounded interference with liberty.
 
 
 32
 420 U.S. at 114, 95 S.Ct. at 863.
 
 
 33
 The plurality opinion in Albright addressed only the "very limited" question of whether the initiation of a prosecution without probable cause violated the petitioner's right to substantive due process, rather than whether the petitioner could prevail on such a claim under the Fourth Amendment. The plurality noted that the petitioner, for tactical or statute-of-limitations reasons, had not "claim[ed] a violation of his Fourth Amendment rights, notwithstanding the fact that his surrender to the State's show of authority constituted a seizure for purposes of the Fourth Amendment," 510 U.S. at 271, 114 S.Ct. at 812; and it declined to address the Fourth Amendment implications of the restriction of the petitioner's "constitutional right to interstate travel" by "the condition imposed upon him pursuant to his release on bond" because the petitioner had neither presented that question in his petition for certiorari nor sought to argue it in his Supreme Court brief, id. at 275 n. 7, 114 S.Ct. at 814 n. 7. Three of the other Albright opinions, however, indicate, consistent with the holding in Gerstein v. Pugh, that the imposition of restrictive conditions of release constitutes a seizure within the meaning of the Fourth Amendment. See, e.g., id. at 278, 114 S.Ct. at 815 (Ginsburg, J., concurring) (noting that a "person facing serious criminal charges is hardly freed from the state's control upon his release from a police officer's physical grip," because, inter alia, "[h]e is often subject ... to the condition that he seek formal permission from the court (at significant expense) before exercising what would otherwise be his unquestioned right to travel outside the jurisdiction " (emphasis added)); id. at 307, 114 S.Ct. at 830 (Stevens, J., dissenting) (noting agreement with Justice Ginsburg's view that "the initial seizure of petitioner continued until his discharge"); id. at 290, 114 S.Ct. at 821-22 (Souter, J., concurring) (noting that movement is restrained when "seizure occurs or bond termsare imposed " (emphasis added)). As Justice Ginsburg observed, a defendant incarcerated until trial no doubt suffers greater burdens. That difference, however, should not lead to the conclusion that a defendant released pretrial is not still "seized" in the constitutionally relevant sense. Such a defendant is scarcely at liberty; he remains apprehended, arrested in his movements, indeed "seized" for trial, so long as he is bound to appear in court and answer the state's charges. He is equally bound to appear, and is hence "seized" for trial, when the state employs the less strong-arm means of a summons in lieu of arrest to secure his presence in court.
 
 
 34
 Id. at 279, 114 S.Ct. at 815 (emphasis added). Cf. Justices of Boston Municipal Court v. Lydon, 466 U.S. 294, 301, 104 S.Ct. 1805, 1809-10, 80 L.Ed.2d 311 (1984) (in habeas corpus context, one released on his own recognizance remains in official custody because he is "subject[ed] ... to restraints not shared by the public generally," such as "an obligation to appear for trial ... on the scheduled day and also at any subsequent time to which the case may be continued," and a "require[ment] that he not depart" from the jurisdiction "without leave" of the court (internal quotation marks omitted)).
 
 
 35
 In sum, while a state has the undoubted authority, in connection with a criminal proceeding, to restrict a properly accused citizen's constitutional right to travel outside of the state as a condition of his pretrial release, and may order him to make periodic court appearances, such conditions are appropriately viewed as seizures within the meaning of the Fourth Amendment.
 
 
 36
 In the present case, one of the conditions imposed upon Murphy's release was that he not leave the State of New York pending resolution of the charges against him, an obvious curtailment of his otherwise unquestionable constitutional right to travel outside of the state. He was further obligated to appear in court in connection with those charges whenever his attendance was required. He indeed was called for court appearances some eight times during the year in which his criminal proceeding was pending. Under the authorities discussed above, therefore, we reject defendants' contention that the conditions imposed following the initiation of the criminal proceeding against Murphy carried no Fourth Amendment implications. We conclude that the restrictions imposed on Murphy constituted a seizure within the meaning of the Fourth Amendment.
 
 
 37
 The question whether that seizure was "unreasonable" within the meaning of that Amendment overlaps the state-law question of whether the criminal proceeding was initiated with probable cause; defendants' challenge to the jury's finding that there was no probable cause is discussed in Part II.B.1. below.
 
 
 38
 Finally, we reject defendants' additional contention that Murphy is barred from pursuing this § 1983 action because New York State law provides a remedy for the partially overlapping tort of malicious prosecution. The cases on which defendants principally rely, Parratt v. Taylor, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), and Hudson v. Palmer, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), dealt with claims alleging deprivations of property without the hearing required by the Due Process Clause. We do not regard those cases as barring all constitutional claims that overlap state-law claims. In Parratt, for example, the Supreme Court expressly distinguished the claims brought in Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), and Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), alleging violations of the Fourth and Eighth Amendments, respectively, from the claims in Parratt based solely on "the Due Process Clause of the Fourteenth Amendment simpliciter." 451 U.S. at 536, 101 S.Ct. at 1913. See also Conway v. Village of Mount Kisco, New York, 758 F.2d 46, 48 (2d Cir.1985) (rejecting argument that § 1983 claim for malicious prosecution was barred simply "because the conduct of which [the plaintiff] complains is tortious under state law"), cert. dismissed, 479 U.S. 84, 107 S.Ct. 390, 93 L.Ed.2d 325 (1986). Nor do any of the opinions in Albright, in which the plaintiff disavowed any claim under the Fourth Amendment, suggest more than that the existence of an adequate state-law remedy removes the need "for intervention under § 1983" where the "suit [is] based on 'the Due Process Clause ... simpliciter.' " 510 U.S. at 285, 114 S.Ct. at 819 (Kennedy, J., concurring in the judgment (quoting Parratt, 451 U.S. at 536, 101 S.Ct. at 1913)).
 
 
 39
 B. The Elements of the State-Law Tort of Malicious Prosecution
 
 
 40
 In order to state a claim for the tort of malicious prosecution under New York State law, a plaintiff must prove "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." Russell v. Smith, 68 F.3d 33, 36 (2d Cir.1995); see Broughton v. State, 37 N.Y.2d 451, 458, 373 N.Y.S.2d 87, 95, 335 N.E.2d 310, cert. denied, 423 U.S. 929, 96 S.Ct. 277, 46 L.Ed.2d 257 (1975). Defendants in the present case did not dispute the first element at trial; they do not dispute the fourth on appeal. Here, they make a limited attack on the jury's finding of probable cause, and they contend that the criminal prosecution was not terminated in Murphy's favor.
 
 1. Probable Cause
 
 41
 Defendants argue that because Murphy testified that, during the initial struggle with Lynn, Murphy stated that he did not want to be handcuffed, the jury was compelled to find that Lynn had probable cause to charge Murphy with resisting arrest. We disagree.
 
 
 42
 Where the question of whether an arresting officer had probable cause is predominantly factual in nature, as where there is a dispute as to the pertinent events, the existence vel non of probable cause is to be decided by the jury. See, e.g., Weyant v. Okst, 101 F.3d 845, 852 (2d Cir.1996); Moore v. Comesanas, 32 F.3d 670, 673 (2d Cir.1994); Restatement (Second) of Torts § 673(2)(a) & comment h (1977) ("Restatement "). Here, the events were sharply disputed, the issue of probable cause was properly put to the jury, and the decision as to whose version to credit was entirely within the province of the jury. The jury was instructed that it could not return a verdict in favor of Murphy unless it found, inter alia, "the absence of probable cause" for the criminal proceeding against him. Its verdict in Murphy's favor means that it found an absence of probable cause, a finding that shows that the jury plainly chose to credit Murphy's version of the events. In light of that choice, defendants' challenge to the finding of no probable cause for the resisting arrest charge is doubly flawed.
 
 
 43
 First, the jury apparently credited Murphy's testimony that after Lynn had issued the traffic citations and had begun to walk back to the patrol car, Lynn ordered him over to the patrol car and began to abuse him verbally and physically, and that the ensuing contretemps was initiated and escalated solely by Lynn. Having credited the testimony that Murphy's conduct was not provocative and that Lynn's conduct was intemperate, physically abusive, and out of control, the jury was entitled to view the mild statement by Murphy that he wished not to be handcuffed or alone with Lynn during the trip to the police station as merely a request designed to avoid further beatings after the arrest, rather than as resistance to the arrest.
 
 
 44
 Second, as a matter of law, an arrest for resisting arrest is not lawful unless the arrest that was supposedly resisted was itself authorized, either by way of an arrest warrant or by the existence of probable cause. See, e.g., Weyant v. Okst, 101 F.3d at 855. Since there was no warrant here, and the jury found no probable cause to arrest Murphy for assault or disorderly conduct, the officers were without authority to arrest Murphy for resisting arrest.
 
 
 45
 Defendants also argue that the jury's finding of no probable cause was impermissible because a presumption of probable cause arises from the grand jury's return of an indictment. That argument, however, is not properly before us since defendants did not raise it in the district court. We note that the presumption is not irrebuttable, see, e.g., Marshall v. Sullivan, 105 F.3d 47, 54 (2d Cir.1996) ("presumption can be overcome by evidence that the indictment was the product of fraud, perjury, the suppression of evidence by the police, or other police conduct undertaken in bad faith"); Colon v. City of New York, 60 N.Y.2d 78, 82-83, 468 N.Y.S.2d 453, 455-56, 455 N.E.2d 1248 (1983) (same), and that had defendants raised this issue in the district court, Murphy would have been entitled to present rebutting evidence.
 
 2. Favorable Termination
 
 46
 Finally, we turn to defendants' contention that they were entitled to prevail as a matter of law because Murphy did not show, as an element of the state-law tort of malicious prosecution, that the criminal proceeding terminated in his favor. The requirement that a plaintiff show such a favorable termination is designed principally to ensure against inconsistent judgments, see Janetka v. Dabe, 892 F.2d 187, 189 (2d Cir.1989), and to avoid parallel litigation as to questions of probable cause, see Loeb v. Teitelbaum, 77 A.D.2d 92, 98, 432 N.Y.S.2d 487, 492 (2d Dep't 1980), modified on other grounds, 80 A.D.2d 838, 439 N.Y.S.2d 300 (2d Dep't 1981).
 
 
 47
 Where the prosecution did not result in an acquittal, it is deemed to have ended in favor of the accused, for these purposes, only when its final disposition is such as to indicate the innocence of the accused. See, e.g., Restatement § 660 comment a; Halberstadt v. New York Life Insurance Co., 194 N.Y. 1, 10-11, 86 N.E. 801, 803-04 (1909) ("Halberstadt "); Hollender v. Trump Village Cooperative, Inc., 58 N.Y.2d 420, 426, 461 N.Y.S.2d 765, 768, 448 N.E.2d 432 (1983) ("Hollender ") (quoting Restatement § 660 comment a ); MacFawn v. Kresler, 88 N.Y.2d 859, 860, 644 N.Y.S.2d 486, 486, 666 N.E.2d 1359 (1996) (mem.) (whether "the final disposition of the proceeding involves the merits and indicates the accused's innocence" (citing Hollender )); O'Brien v. Alexander, 101 F.3d 1479, 1486-87 (2d Cir.1996) (discussing cases); Russell v. Smith, 68 F.3d at 36 ("In the absence of a decision on the merits, the plaintiff must show that the final disposition is indicative of innocence."). The answer to whether the termination is indicative of innocence depends on the nature and circumstances of the termination; the dispositive inquiry is whether the failure to proceed "impl[ies] a lack of reasonable grounds for the prosecution," Loeb v. Teitelbaum, 77 A.D.2d at 101, 432 N.Y.S.2d at 494.
 
 
 48
 Certain types of dispositions that do not result from adjudication of the merits have generally been held not sufficiently favorable to the accused to be indicative of innocence. These include dismissals for lack of subject matter jurisdiction, see, e.g., Heaney v. Purdy, 29 N.Y.2d 157, 159-60, 324 N.Y.S.2d 47, 49, 272 N.E.2d 550 (1971), and dismissals pursuant to N.Y.Crim. Pro. L. § 170.30(1)(a) for failure to allege sufficient facts to support the charge, see, e.g., MacFawn v. Kresler, 88 N.Y.2d at 860, 644 N.Y.S.2d at 487, 666 N.E.2d 1359. The principal rationale is that dismissals of these types may not end the state's pursuit of the accused on the same charges, for a renewed prosecution may be commenced in a proper court on a facially sufficient pleading. See, e.g., id. In addition, some other types of dismissals that preclude further prosecution on the same charges are deemed not to be favorable to the accused for purposes of a malicious prosecution claim. These include "adjournment[s] in contemplation of dismissal," see, e.g., Hollender, 58 N.Y.2d at 424-26, 461 N.Y.S.2d at 767-68, 448 N.E.2d 432, which are conditional dismissals that become final if the accused meets certain criteria during a six-month period, see N.Y.Crim. Pro. L. § 170.55 (McKinney 1993). Similarly, dismissals by the prosecution "in the interests of justice" under N.Y.Crim. Pro. L. § 170.40, are generally considered not to be dispositions in favor of the accused. See, e.g., MacLeay v. Arden Hill Hospital, 164 A.D.2d 228, 230-31, 563 N.Y.S.2d 333, 334-35 (3d Dep't 1990), appeal denied, 77 N.Y.2d 806, 568 N.Y.S.2d 913, 571 N.E.2d 83 (1991); Miller v. Star, 123 A.D.2d 750, 751, 507 N.Y.S.2d 223, 224 (2d Dep't 1986) (mem.). See also Hygh v. Jacobs, 961 F.2d 359, 368 (2d Cir.1992) ("as a matter of law" a dismissal in the interests of justice "cannot provide the favorable termination required as the basis for a claim of malicious prosecution"); but see Hankins v. Great Atlantic & Pacific Tea Co., 208 A.D.2d 111, 114-16, 622 N.Y.S.2d 678, 680-81 (1st Dep't 1995) (dismissal in the interests of justice can be a favorable termination, depending on the facts and circumstances surrounding the dismissal).
 
 
 49
 The matter of whether the prosecution's effective abandonment of a prosecution, resulting in a termination "with prejudice" and thus foreclosing a new prosecution of the accused on the same charges, constitutes a termination favorable to the accused for purposes of a malicious prosecution claim generally depends on the cause of the abandonment. The prevailing view is that if the abandonment was the result of a compromise to which the accused agreed, or an act of mercy requested or accepted by the accused, or misconduct by the accused, it is not a termination in favor of the accused for purposes of a malicious prosecution claim. See, e.g., Restatement § 660; Halberstadt, 194 N.Y. at 11, 86 N.E. at 804. An abandonment brought about by the accused's assertion of a constitutional or other privilege, however, such as the right to a speedy trial, does not fall within these categories, for the accused should not be required to relinquish such a privilege in order to vindicate his right to be free from malicious prosecution. See, e.g., Lenehan v. Familo, 79 A.D.2d 73, 76, 436 N.Y.S.2d 473, 475 (4th Dep't 1981); Restatement § 660 comment d.
 
 
 50
 The New York Court of Appeals has not yet decided the precise question of whether the dismissal of a criminal prosecution for failure to prosecute or for failure to comply with speedy-trial requirements should be considered, for malicious prosecution purposes, a termination favorable to the accused. The intermediate state appellate courts considering that question, however, have generally concluded that such dismissals are favorable to the accused. See, e.g., Loeb v. Teitelbaum, 77 A.D.2d at 97-102, 432 N.Y.S.2d at 491-94 (dismissal for failure to prosecute); Campo v. Wolosin, 211 A.D.2d 660, 660, 622 N.Y.S.2d 291, 292 (2d Dep't 1995) (mem.) (same); Reit v. Meyer, 160 A.D. 752, 146 N.Y.S. 75, 79 (1st Dep't 1914) (same); Lenehan v. Familo, 79 A.D.2d at 76, 436 N.Y.S.2d at 475 (dismissal for failure to meet speedy-trial requirements); Vitellaro v. Eagle Insurance Co., 150 A.D.2d 770, 771, 541 N.Y.S.2d 614, 615 (2d Dep't 1989) (same). See also Witcher v. Children's Television Workshop, 187 A.D.2d 292, 294-295, 589 N.Y.S.2d 454, 456 (1st Dep't 1992) (mem.) (affirming dismissal for failure to plead favorable termination, and suggesting obiter that a speedy-trial dismissal is not necessarily a termination favorable to the accused). Part of the rationale for viewing a dismissal for the prosecution's failure to prosecute in timely fashion as favorable to the accused is that "the failure to proceed to the merits compels an inference of such an unwillingness or inability to do so as to imply a lack of reasonable grounds for the prosecution." Loeb v. Teitelbaum, 77 A.D.2d at 101, 432 N.Y.S.2d at 494; see generally Halberstadt, 194 N.Y. at 10-11, 86 N.E. at 803-04. Further, to view a dismissal for failure to prosecute within the time allowed as a termination not favorable to the accused would have the effect of unfairly "compel[ling] one charged with a criminal offense to waive his constitutional or statutory right to a speedy trial in order to preserve his right to civil retribution for a demonstrated wrong." Lenehan v. Familo, 79 A.D.2d at 77, 436 N.Y.S.2d at 476. See also Loeb v. Teitelbaum, 77 A.D.2d at 102, 432 N.Y.S.2d at 494 (warning that the opposite rule would "compel individuals charged with criminal offenses--and who may desire civil retribution--to resist dismissal of the charges against them in the face of the prosecutor's failure to prosecute and the court's desire to dismiss the complaints").
 
 
 51
 These intermediate appellate decisions have analyzed the nature of the failure-to-prosecute and speedy-trial dismissals in the same manner as the state's highest court has analyzed other dismissals. Compare Heaney v. Purdy, 29 N.Y.2d at 160, 324 N.Y.S.2d at 49, 272 N.E.2d 550 (to be favorable, the disposition must "fairly impl(y) lack of a reasonable ground for the prosecution" (internal quotation marks omitted)), and Halberstadt, 194 N.Y. at 11, 86 N.E. at 804 (same), with Loeb v. Teitelbaum, 77 A.D.2d at 101, 432 N.Y.S.2d at 494 ("the failure to proceed to the merits compels an inference of such an unwillingness or inability to do so as to imply a lack of reasonable grounds for the prosecution"), and Vitellaro v. Eagle Insurance Co., 150 A.D.2d at 771, 541 N.Y.S.2d at 615 (speedy-trial dismissal is favorable to accused "because it implies a lack of reasonable ground for the prosecution"). The Appellate Division decisions relied on the principles set out in Halberstadt and the Restatement; those principles were adopted by the New York Court of Appeals in Hollender, 58 N.Y.2d at 425-26, 461 N.Y.S.2d at 768, 448 N.E.2d 432; and we have seen no indication of a renunciation by that Court of those principles, see MacFawn v. Kresler, 88 N.Y.2d at 860, 644 N.Y.S.2d at 486, 666 N.E.2d 1359 (citing Halberstadt and Hollender ).
 
 
 52
 We note also that the principles followed by the New York cases reflect the view prevailing in other jurisdictions. See, e.g., Lackner v. LaCroix, 25 Cal.3d 747, 750-51, 159 Cal.Rptr. 693, 602 P.2d 393, 395 (1979) ("A dismissal for failure to prosecute ... does reflect on the merits of the action.... The reflection arises from the natural assumption that one does not simply abandon a meritorious action once instituted." (internal quotation marks omitted)); Miller v. Watkins, 200 Mont. 455, 463-64, 653 P.2d 126, 130 (1982) (speedy-trial dismissal is favorable to accused). Indeed, several states, in ruling that dismissals for failure to comply with speedy-trial requirements were terminations favorable to the accused for purposes of a later claim for malicious prosecution, have relied in part on the reasoning of the leading New York cases. See, e.g., Rich v. Baldwin, 133 Ill.App.3d 712, 715-17, 88 Ill.Dec. 748, 479 N.E.2d 361, 363-64 (1985) (dismissal for failure to meet speedy-trial requirements is favorable to accused) (discussing Lenehan v. Familo, 79 A.D.2d at 76, 436 N.Y.S.2d at 475, and Loeb v. Teitelbaum, 77 A.D.2d at 101, 432 N.Y.S.2d at 494); Gumm v. Heider, 220 Or. 5, 23-24, 348 P.2d 455, 464 (1960) (same) (citing Halberstadt, 194 N.Y. at 10, 86 N.E. at 803); see also Wynne v. Rosen, 391 Mass. 797, 799-800, 464 N.E.2d 1348, 1350-51 (1984) (same re prosecutor's nolle prosequi, or formal abandonment of the prosecution) (citing Loeb v. Teitelbaum, 77 A.D.2d at 99-100, 432 N.Y.S.2d at 492-93).
 
 
 53
 In sum, the body of New York State caselaw, like the decisions of other states, holds that dismissals for lack of timely prosecution should generally be considered, for purposes of a claim of malicious prosecution, a termination favorable to the accused. We have seen no reason to infer that the New York Court of Appeals would adopt a different view.
 
 
 54
 In general, the issue of whether a given type of termination was favorable to the accused is a matter of law for the court. If, however, there is a question as to the nature of the circumstances leading to that termination, that question is one for the trier of fact. See, e.g., Russo v. State of New York, 672 F.2d 1014, 1020 (2d Cir.1982) (issue of favorable termination is one for judge if defendant presents no conflicting evidence as to the reason for the dismissal), modified on other grounds, 721 F.2d 410 (2d Cir.1983); Lenehan v. Familo, 79 A.D.2d at 76, 436 N.Y.S.2d at 475 (issue is one of law in absence of factual dispute surrounding the reasons for the dismissal); Restatement §§ 673(1)(b) and (2)(c); id. § 673 comment e ("upon the issue[ ] of favorable termination ..., the jury has only the function of finding the circumstances under which the defendant acted. The court determines whether, under those circumstances, the termination was sufficiently favorable to the accused....").
 
 
 55
 In the present case, the district court properly applied these principles. That court had before it the state court's decision dismissing the prosecution of Murphy for violation of his right to a speedy trial. The state court had held a hearing into the reasons for the prosecution's failure to be ready for trial within the period required by New York law, receiving testimony from defense counsel and the assistant district attorney. Although under New York law, the prosecution of Murphy could not proceed on the felony charges until there was an indictment, the matter was not even presented to the grand jury until some six months after the criminal proceeding had been commenced. The state court found that more than four months of that delay was unreasonable and that there was no valid excuse for the overall failure to proceed with the prosecution expeditiously. Midway through the present trial, the district court alerted defendants, outside the presence of the jury, to the district court's view that Murphy had met his burden of showing a favorable termination of the criminal proceeding and would prevail on that issue as a matter of law unless defendants produced the prosecutor to testify to some non-merits-based explanation for the failure to pursue the prosecution of Murphy:
 
 
 56
 Every lawyer in this room, including the Court, knows what happened here, and it doesn't really show on the official record, but the point is that there was no enthusiasm on the part of the District Attorney's Office to prosecute this case, and that was known to everybody all along.... You know it and I know they didn't prosecute it because they had no enthusiasm for the case. This was a nice, easy way of kissing it off.
 
 
 57
 So I'm making a ruling that he has proved a prima facie case on [the favorable termination] element, but you can rebut it if someone comes here and has the temerity to testify under oath the reason the case was dismissed was because he lost a file, or I didn't realize it was scheduled, or the witnesses had all left town, or some legitimate reason, which none of us believe happened. You are free to do that.
 
 
 58
 (Trial Transcript, February 23, 1996, at 161.) This ruling was in accordance with New York authority and properly reflected the policies underlying those decisions. To rule otherwise would encourage state officials, hoping to shield wrongdoing officers--and perhaps their municipalities--from liability, to commence criminal prosecutions against the victims of that wrongdoing and simply hold the criminal charges in abeyance until a court is forced to dismiss the case after six or more months. Such a prolongation of proceedings can itself further injure a person maliciously accused without probable cause. In this case, for example, the numerous court appearances Murphy was forced to make in the course of the 13 months in which the criminal proceeding was pending often caused him to miss work and were a substantial factor in his ultimately losing his job. The pendency of the prosecution also cost him other prospective employment.
 
 
 59
 Defendants chose not to call the assistant district attorney as a trial witness to offer any non-merits-based explanation for the failure to proceed against Murphy. Accordingly, the district court properly decided the favorable-termination question as a matter of law, and properly instructed the jury that Murphy had established that element of his malicious prosecution claim.
 
 C. Attorneys' Fees
 
 60
 Defendants contend that the district court's award of attorneys' fees to Murphy was excessive, arguing principally that a $200 hourly rate was too high and that there should have been a reduction for claims on which Murphy did not prevail. These contentions need not detain us long.
 
 
 61
 In determining the reasonable fee to be awarded to Murphy as the prevailing party, the district court followed the approach set out in Hensley v. Eckerhart, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), and considered all of the appropriate factors. The determination of a "lodestar" figure and the assessment of what adjustments to that figure are warranted to account for, for example, unnecessary or unproductive services, are committed to the sound discretion of the district court. See, e.g., Cruz v. Local Union Number 3 of International Brotherhood of Electrical Workers, 34 F.3d 1148, 1160 (2d Cir.1994) ("A district court's 'choice of rates [is] well within [its] discretion.' " (quoting Cabrera v. Jakabovitz, 24 F.3d 372, 393 (2d Cir.), cert. denied, 513 U.S. 876, 115 S.Ct. 205, 130 L.Ed.2d 135 (1994))). A plaintiff's lack of success on some of his claims does not require the court to reduce the lodestar amount where the successful and the unsuccessful claims were interrelated and required essentially the same proof. See, e.g., Hensley v. Eckerhart, 461 U.S. at 434-35, 103 S.Ct. at 1939-40; Lunday v. City of Albany, 42 F.3d 131, 134 (2d Cir.1994) (per curiam) (reduction not required so long as the unsuccessful claims were not "wholly unrelated to the plaintiff's successful claims" (internal quotation marks omitted)); Grant v. Bethlehem Steel Corp., 973 F.2d 96, 101 (2d Cir.1992) (reduction not required where each claim against each defendant arose out of the same "core of facts"), cert. denied, 506 U.S. 1053, 113 S.Ct. 978, 122 L.Ed.2d 132 (1993). The district court's determinations of these matters are reviewable only for abuse of discretion. See generally Orchano v. Advanced Recovery, Inc., 107 F.3d 94, 99 (2d Cir.1997); In re Bolar Pharmaceutical Co. Securities Litigation, 966 F.2d 731, 732 (2d Cir.1992) (per curiam).
 
 
 62
 In the present case, Murphy applied for attorneys' fees and expenses in the amount of $95,621.17. His attorneys represented that their normal hourly rate was $200, and they submitted records showing the amounts of time they had spent on various aspects of their representation of Murphy in this action. After reviewing Murphy's submissions and defendants' objections, the district court, by Memorandum and Order dated April 18, 1996, concluded that reasonable fees plus expenses totaled $89,888.17. The court found that the "professional skill brought to the case by [Murphy's attorney] equals or exceeds in all respects the customary standard in similar litigation in this Court" and that the $200 hourly rate claimed by plaintiff's attorneys was "reasonable in light of current market conditions." Id. at 2. Although it awarded $5,675 less than requested, the court declined to exclude time spent in pursuit of Murphy's claims for false arrest and use of excessive force, and claims against other defendants, which were ultimately dismissed. The court stated that it could not "separate by any rational means the portion of the time occupied in connection with the claims and defendants which did not survive and which were not presented to or accepted by the trial jury." Id. The court's determinations were supported by the record. Murphy plainly needed to present the evidence of the events surrounding his arrest in order to prove the probable cause and malice elements of his claim of malicious prosecution. Defendants have not shown that the award was an abuse of discretion.
 
 
 63
 Defendants' additional contention that Murphy should not have been compensated for the expense of the prior appeal, Murphy I, is frivolous. The entire case had been dismissed on statute-of-limitations grounds; on that appeal Murphy contended only that the § 1983 claims for malicious prosecution were timely; those claims were reinstated; and on remand he prevailed before the jury. He was entitled to reimbursement for the appeal necessitated by defendants' nonmeritorious motion to dismiss those claims as untimely.
 
 CONCLUSION
 
 64
 We have considered all of defendants' arguments on this appeal and have found them to be without merit. The judgment of the district court is affirmed.
 
 
 65
 In addition, Murphy is entitled to recover reasonable attorneys' fees in connection with this appeal, see, e.g., Cohen v. West Haven Board of Police Commissioners, 638 F.2d 496, 506 (2d Cir.1980), the amount to be determined by the district court.
 
 JACOBS, Circuit Judge, dissenting:
 
 66
 Although I agree with much in the majority opinion, I respectfully dissent because I see no basis for Murphy's malicious prosecution claim under the Fourth Amendment.
 
 
 67
 Albright makes plain that a § 1983 claim for malicious prosecution must be premised on a violation of a Fourth Amendment right. See 118 F.3d at 944. Although Murphy may have been richly entitled to a recovery under causes of action that are time-barred, see Murphy I, 53 F.3d 547, 548 (2d Cir.1995), the majority opinion correctly holds that Murphy cannot prevail unless he can show a post-arraignment seizure. The majority goes on to say, erroneously, that Murphy was seized by reason of (i) the restriction on out-of-state travel imposed as a condition of Murphy's release, and (ii) Murphy's required appearances in court.
 
 
 68
 These limitations on Murphy's freedom do not rise to the level of a constitutional deprivation under the Fourth Amendment. Under the majority's analysis, every defendant in a criminal case will be deemed to be seized: at one end of the continuum, a defendant will be in jail, and thus be seized in fact; at the other end, a defendant will be released on recognizance (like Murphy) and be deemed seized anyway by reason of the incidental travel restriction and the obligation to appear in court. (It is undisputed that in New York no person against whom a criminal charge is pending may leave the state without the prior permission of the court.) In effect, the majority opinion adopts Justice Ginsburg's solitary concurrence in Albright, that the pendency of a criminal proceeding alone is enough to support a § 1983 claim under the Fourth Amendment--a view that two circuits have rejected and a third has questioned.[1] Perhaps the majority of this Panel believes that release on one's own recognizance is analogous to being held in jail--but that is a view that no one in a cell is likely to share.
 
 
 69
 The majority errs by failing in this case to observe the distinction we drew in Singer v. Fulton County Sheriff, 63 F.3d 110 (2d Cir.1995) between the state tort of malicious prosecution and a § 1983 claim for malicious prosecution in violation of the Fourth Amendment. The majority does not expressly erase that distinction; but by ignoring it in this case, the majority invites the federalizing of the tort of malicious prosecution. The law of this Circuit requires that a § 1983 plaintiff allege and prove, in addition to the elements of the state malicious prosecution tort action, "some post-arraignment deprivation of liberty that rises to the level of a constitutional violation." Id. at 117. Murphy failed to show any such constitutional deprivation in respect of his remaining claim for malicious prosecution.
 
 
 70
 Neither of the restrictions cited by Murphy amounts to a Fourth Amendment seizure.
 
 
 71
 (1) Murphy's freedom to travel out-of-state was limited, and he should have been free of that restraint. But was he seized? The constitutional right implicated here is the right to travel, and that right (as the majority virtually concedes) cannot be localized in the Fourth Amendment, except I suppose to the extent that one incident of being held in prison in New York is that one cannot go to Ohio. See Zobel v. Williams, 457 U.S. 55, 60 n. 6, 102 S.Ct. 2309, 2312, 72 L.Ed.2d 672 (1982) ("both the nature and the source of [the right to travel] have remained obscure"). But, in my view, a person who is free to come and go in his own town and state cannot be said to be "seized" within the meaning of the Fourth Amendment.
 
 
 72
 Although the majority opinion concedes that the "roots [of the right to travel] have never been identified with particularity," 118 F.3d at 945, the opinion argues that Gerstein v. Pugh, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975) "made plain that the liberties protected by [the Fourth] Amendment included the accused's freedom to travel while on pretrial release," id. at 945. But the way in which Gerstein supposedly makes this "plain" is that Gerstein cites the (now-repealed) 18 U.S.C. § 3146(a)(2) to illustrate the "burdensome conditions that may effect a significant restraint of liberty." 118 F.3d at 945-46. True, the conditions of release listed in § 3146(a)(2) include restrictions on travel, but that subsection also lists restrictions on "place of abode," a category that includes home detention, which may well amount to seizure under the Fourth Amendment. There is no way to tell whether the Supreme Court intended to classify travel restriction as a "burdensome condition," but I do not agree that the citation to § 3146(a)(2) in Gerstein settles the issue or "makes plain" much of anything.
 
 
 73
 In any event, I would not reach that question in this case, because Murphy did not plead and did not prove that the limitation on his right to travel had the slightest effect on his comings and goings. Murphy's complaint does not mention the right to travel.[2] And the district court erroneously charged the jury that "if you find that [Murphy] was forbidden from leaving the State of New York, that may be regarded by the jury as significant deprivation of his liberty, even if there is no evidence that he actually would have left the state or intended to leave the state during the period that he was so restricted." (Emphasis added.) Murphy points to no record evidence that he sought to leave New York, or was denied permission to leave--or had ever set foot outside the state. This is no mere detail. Without some evidence on this subject (and a charge reflecting Murphy's burden to prove his case), the jury could not determine the extent of any limitation on Murphy's actual freedom of movement, or formulate a non-speculative compensatory award. "The abstract value of a constitutional right may not form the basis for § 1983 damages." Memphis Community School Dist. v. Stachura, 477 U.S. 299, 308, 106 S.Ct. 2537, 2543, 91 L.Ed.2d 249 (1986).
 
 
 74
 It is self-evident that a citizen held by the authorities in jail or in a police station, or even in home confinement, has suffered a deprivation of a liberty that would otherwise be exercised and enjoyed. But I do not see how the limitation on out-of-state travel can support compensatory damages without a showing by Murphy that he successfully sought leave to travel (a humiliation that in itself might arguably support a damages award); or sought leave and was denied (a circumstance that might well support an award); or wished to go but decided to forgo the opportunity rather than ask. See Carey v. Piphus, 435 U.S. 247, 257, 98 S.Ct. 1042, 1048-49, 55 L.Ed.2d 252 (1978) ("a person should be compensated fairly for injuries caused by the violation of his legal rights"); Singer, 63 F.3d at 116 (damages award "must always be designed to compensate injuries caused by the [constitutional] deprivation") (internal quotations omitted). Cf. Nordlinger v. Hahn, 505 U.S. 1, 10-11, 112 S.Ct. 2326, 2331-32, 120 L.Ed.2d 1 (1992) (no standing to challenge residency provision of state constitution on right to travel grounds where complaint did not allege that individual plaintiff was impeded from travelling or settling within the state). With such a record, a jury would have a basis for arriving at some compensatory dollar award (assuming the travel limitation violated Murphy's Fourth Amendment rights), and such an award might well be appropriate. See King v. Macri, 993 F.2d 294, 297 (2d Cir.1993) (compensatory damages are appropriate in § 1983 malicious prosecution cases where damages are adequately supported). On the present record, however, the 6-month bar on Murphy's freedom to leave the state is no more palpable or compensable a restraint than a bar on his visiting another planet.
 
 
 75
 (2) Equally strange is the majority's holding that Murphy was seized within the meaning of the Fourth Amendment because he was required to appear in court. A probable cause determination is required only for "those suspects who suffer restraints on liberty other than the condition that they appear for trial." Gerstein, 420 U.S. at 125 n. 26, 95 S.Ct. at 869 n. 26 (emphasis added). No doubt a court appearance is burdensome, and eight of them constitutes a burden that is not hypothetical or minor: indeed, the only record evidence of economic loss is Murphy's loss of employment because he was so frequently in court. But I had previously thought that a defendant's court appearances were occasions for the conduct of due process. See, e.g., Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 313, 70 S.Ct. 652, 656-57, 94 L.Ed. 865 (1950) (due process requires at a minimum "that deprivation of life, liberty or property by adjudication be preceded by ... opportunity for hearing appropriate to the nature of the case"); cf. U.S. Const., amend. XIV, § 1. Indeed, the outcome of the court proceedings in this case was dismissal of the charges against Murphy.[3] The majority has thus transmuted due process itself into a constitutional tort.
 
 
 
 [3]
 I agree with the majority that the dismissal of the charges constituted a favorable termination of the proceedings against Murphy; however, I do not believe that dismissal for lack of a speedy trial always bespeaks innocence. The question of a favorable termination is often a fact-specific inquiry. See, e.g., Hankins v. Great Atl. and Pac. Tea Co., 622 N.Y.S.2d 678, 680-81, 208 A.D.2d 111 (1st Dep't 1995) (dismissal "in interests of justice" where criminal defendant had submitted uncontroverted alibi may constitute a favorable termination); Campo v. Wolosin, 622 N.Y.S.2d 465, 211 A.D.2d 661 (2d Dep't 1995) (Mem.) (dismissal for failure to prosecute, where prosecutors lacked interest in pursuing case, was indicative of innocence). The district court's sound ruling on this question was expressly grounded on the evidence