FILED
United States Court of Appeals
Tenth Circuit

**March 8, 2016**

Elisabeth A. Shumaker
Clerk of Court

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

STEPHAN CORDOVA,

        Plaintiff - Appellant,

v.

CITY OF ALBUQUERQUE; RAY
SCHULTZ, Chief; CARLOS
ARGUETA; AARON HEYMAN;
MATTHEW HOISINGTON; KEVIN
KEES; JAMES FOX; and KENNETH
NEIBERGER,

        Defendants - Appellees.

No. 14-2083

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. NO. 1:11-cv-00806-GBW-WPL)**

---

Joseph P. Kennedy (Shannon L. Kennedy with him on the briefs), Kennedy
Kennedy & Ives, LLC, Albuquerque, New Mexico, for Appellant.

David A. Roman, Robles, Rael & Anaya, P.C., Albuquerque, New Mexico, for
Appellees.

---

Before **TYMKOVICH,** Chief Judge, **EBEL**, and **GORSUCH**, Circuit Judges.

---

**TYMKOVICH**, Chief Judge.

---

Three Albuquerque Police Department officers shot Stephan Cordova after he raised a gun in their direction. Cordova survived and was charged with assault, although the charges were later dismissed on speedy trial grounds. Cordova then brought this action under 42 U.S.C. § 1983, claiming primarily (1) that the charges of assault were brought in bad faith; (2) that the police unreasonably prevented interaction with his family when he was in a hospital recovering from his wounds; and (3) the police used excessive force by firing on him without an adequate warning. The district court allowed only the Fourth Amendment excessive-force claims to go to trial, where a jury returned a verdict for the officers.

We find no error in the district court's conclusions. As we explain below: (1) under the facts of this case, the dismissal of the assault charges under the Speedy Trial Act is not indicative of Cordova's innocence and thus does not qualify as a favorable termination for purposes of a malicious prosecution cause of action; (2) Cordova's familial-association claim fails because the prohibition on visitors was not intended to interfere with a protected relationship and was reasonably related to a legitimate government purpose; and (3) as to the excessive force claim, Cordova was adequately warned to drop a weapon he was wielding at the time of the shooting, and the district court correctly instructed the jury as to the applicable law.

Exercising jurisdiction under 28 U.S.C. § 1291, we AFFIRM.

-2-

# I.  Background

Stephan Cordova became ill at his work site.  He called his mother for a lift to his brother's house, where he was living.  After his mother left him, his sister-in-law checked on him and found him seriously ill.  She called an ambulance, believing that Cordova was having a heart attack.  Cordova refused her offer to drive him to the hospital and told her that he would not get in the ambulance.  When she told him that he had to go, he replied that he did not have to go anywhere because he had a gun.

When paramedics arrived, the sister-in-law told them that he was refusing treatment and that he had a gun.  The Albuquerque Police were called, and officers Fox, Hoisington, Neiberger, and Kees responded.  The officers quickly learned of his threats and instructed family members to leave the house.  Officer Fox was also told about Cordova's physical condition and that he was in the middle of a difficult divorce.  Officer Fox thought, at that point, Cordova might be suicidal.

Cordova eventually exited the house.  The officers approached him and asked him to stop and show his hands before moving further.  Cordova began walking backward down the street and Officer Kees noticed that Cordova had a gun in his waistband.  According to the officers, he kept touching the gun at his waist, despite their repeated warnings to keep his hand away.

Cordova then drew the gun slowly, and held it at his waist, pointing down. Sergeant Fox then ordered Cordova to drop the gun. The three officers then claim to have simultaneously observed Cordova raising the gun in their direction, and all three fired, hitting Cordova eight times. After the shooting, Cordova was taken to a hospital for emergency surgery. During recovery, officers restricted access to his hospital room until he was able to speak with investigators.

Because of his injuries, Cordova was unable to communicate for five days. When he was finally well enough to speak with police, he invoked his right to counsel. The police lifted the access restriction but did not intend for him to be released from the hospital. The police also charged him with assault and an arrest warrant was issued by a state court.

While still in the hospital, Cordova filed a motion to dismiss the complaint, quash the warrant, and to waive his first appearance. A court later set bond, and in an order setting conditions of release, the judge handwrote "D to remain in custody at [the hospital] until further notice." App. at 691. Despite the order, the next day the hospital discharged Cordova and detectives transferred him to a county detention center.

Cordova was later indicted, but moved to dismiss the indictment on the grounds that he had not been given an opportunity to present exculpatory evidence to the grand jury. The state court granted this motion to dismiss. Cordova was then re-indicted, and after a two-year delay again moved to dismiss

the indictment on the grounds that the trial court had given an erroneous jury instruction. Undeterred, the state again indicted Cordova. He moved to dismiss this indictment on speedy trial grounds, given that nearly five years had passed from the filing of the initial criminal complaint. Over the state's objection, the court granted the motion.

Cordova then brought this action under 42 U.S.C. § 1983 alleging a variety of federal constitutional violations, including excessive force, malicious prosecution and interference with his right to associate with his family.

## II. Analysis

Cordova alleges the district court erred in granting summary judgment on his § 1983 malicious prosecution, familial association, and due process claims. For his excessive force claims, he contends the district court should have entered judgment in his favor or, at least, allowed a new trial because of a variety of trial and instructional errors.[1]

We discuss each of Cordova's claims in turn.

### A. *Malicious Prosecution*

---

[1] In his reply brief, Cordova also challenged the dismissal of his municipal-liability claims against the City of Albuquerque. However, his attorney admitted at oral argument that he had waived this issue by failing to include it in his opening brief. *See Reedy v. Werholtz*, 660 F.3d 1270, 1274 (10th Cir. 2011) ("[A] party waives issues and arguments raised for the first time in a reply brief.").

The district court granted summary judgment on Cordova's malicious-prosecution claim because he failed to establish, as a matter of law, that the charges against him were terminated in his favor. He challenges the district court's conclusion, contending that the dismissal of charges against him under New Mexico's Speedy Trial Act constituted a favorable termination.

To prevail on a § 1983 malicious-prosecution claim, a plaintiff must show: (1) the defendant caused the plaintiff's confinement or prosecution; (2) the original action terminated in the plaintiff's favor; (3) there was no probable cause to confine or prosecute the plaintiff; (4) malice; and (5) damages. *Wilkins v. DeReyes*, 528 F.3d 790, 799 (10th Cir. 2008). It is the plaintiff's burden to show that the termination was favorable. *Id.* at 803. Although the dismissal of the assault charges certainly worked to Cordova's benefit, we agree with the district court that it was not a favorable termination under prevailing law.

We most recently analyzed the contours of the favorable termination requirement in *Wilkins*. There, the prosecutor had dismissed the underlying charges by filing a so-called *nolle prosequi*—a voluntary dismissal of charges. *Id.* at 802. We found the mere fact that a prosecutor had chosen to abandon a case was insufficient to show favorable termination. Instead, the termination must in some way "indicate the innocence of the accused." *Id.* at 803 (quoting Restatement (Second) of Torts § 660 cmt. a (1977)). When it is unclear whether the termination indicates innocence, we "look to the stated reasons for the

dismissal as well as to the circumstances surrounding it" and determine "whether the failure to proceed implies a lack of reasonable grounds for the prosecution." *Id.* (quoting *Murphy v. Lynn*, 118 F.3d 938, 948 (2d Cir. 1997)). Or, as a leading treatise put it, the abandonment of prosecution that "does not touch the merits . . . leaves the accused without a favorable termination." Dan B. Dobbs et al., Dobb's Law of Torts § 590 (2d ed. 2015).

In this case, Cordova's assault charges were dismissed on speedy trial grounds after a series of procedural blunders by the prosecution that resulted in three failed indictments. The original indictment was dismissed because the state failed to give Cordova the opportunity to testify before the grand jury. The state then obtained a second indictment, but Cordova obtained a dismissal two years later because the grand jury was never instructed on a necessary element of the charges. After the grand jury returned a third indictment, the trial court dismissed the action with prejudice on speedy trial grounds over the state's objection, reasoning that Cordova had been prejudiced by the repeated delays. This whole process took approximately five years.

As an initial matter, Cordova has not presented any argument that the length of the process was attributable to intentional delay or the prosecution's misgivings about the likelihood of a conviction. After the third indictment, the state explained that part of the delay was due to its prosecutor being new to the case and needing to catch up. In addition, the state court found Cordova had

failed to invoke his speedy trial rights in a clear and timely manner during the pendency of the third indictment. And, in fact, prior to the third dismissal, the state expressed its desire and readiness to proceed to trial. Applying *Wilkins*, the district court found the underlying charges were dismissed on technical, procedural grounds which had nothing to do with the merits of the case. Given these undisputed facts, we agree with the district court that the circumstances surrounding this dismissal are not indicative of Cordova's innocence.

Cordova asks us to set aside our indicative-of-innocence standard and find that speedy trial dismissals are *per se* favorable. In support of his position, he cites to Second Circuit cases and a New York state court case holding that a dismissal under New York's Speedy Trial Act qualifies as a favorable termination. *See Rogers v. City of Amsterdam*, 303 F.3d 155 (2d Cir. 2002); *Smith-Hunter v. Harvey*, 734 N.E.2d 750, 755 (N.Y. 2000); *see also Posr v. Court Officer Shield No. 207*, 180 F.3d 409 (2d Cir. 1999); *Murphy v. Lynn*, 118 F.3d 938 (2d Cir. 1997).

These cases find speedy trial dismissals qualify as favorable terminations for three reasons. First, they have reasoned that a state's failure to proceed in a timely manner usually indicates a lack of reasonable grounds for prosecution. *See, e.g.*, *Murphy*, 118 F.3d at 951. While this may be true, we see no reason to adopt a *per se* rule prohibiting district courts from considering the circumstances of each dismissal. As is the case here, there will doubtless be instances where the

dismissal at issue is attributable to technical or procedural errors that do not reflect the merits of the underlying charges.

Second, these cases theorize that any other rule would incentivize prosecutors to abandon weak charges rather than dismissing them outright, allowing them to obtain speedy trial dismissals and thus avoid malicious prosecution claims. *Rogers*, 303 F.3d at 160. Again, individual consideration of the circumstances surrounding each dismissal adequately addresses this concern. *See Smith-Hunter*, 734 N.E.2d at 756. Nothing in our opinion prevents district courts from finding that unexplained delay indicates a lack of reasonable grounds for prosecution.

Even the Second Circuit's *Murphy* decision supports our determination that not all speedy trial dismissals qualify as favorable terminations. In *Murphy*, the prosecution failed to present any explanation for its delay in bringing the defendant to trial. 118 F.3d at 951. As a result, the district court held that the prosecution's unexplained delay was prima facie proof of favorable termination. *Id.* The court noted, however, that the state could rebut this presumption if someone from the prosecutor's office were to testify that the delay was attributable to circumstances unrelated to the merits of the case. *Id.* The Second Circuit endorsed this approach, concluding, "Defendants chose not to call the assistant district attorney as a trial witness to offer any non-merits-based explanation for the failure to proceed against Murphy. Accordingly, the district

court properly decided the favorable-termination question as a matter of law . . . ." *Id.* We are thus in agreement with both *Murphy* and the majority of other courts in holding that speedy trial dismissals do not *per se* constitute favorable terminations.

The final argument made in the New York line of cases is that basic fairness requires us to recognize speedy trial dismissals as favorable. They argue that it would be unjust to force a criminal defendant to choose between enforcing his speedy trial rights and maintaining the ability to bring a malicious prosecution action. But these cases fail to recognize that such trade-offs are a standard feature of malicious prosecution law. Courts routinely find that dismissals resulting from a defendant's exercise of his statutory (or even constitutional) rights are not favorable for the purposes of a later malicious prosecution claim. For example, as noted in *Wilkins*, a termination may not be favorable even when the charges are abandoned. This is the case, for example, when key evidence is ruled inadmissable. When "evidence [is] only suppressed on 'technical' grounds having no or little relation to the evidence's trustworthiness, then the fact that there [is] not other sufficient evidence [is] not . . . indicative of innocence." *Wilkins*, 528 F.3d at 804 (quoting *Dobiecki v. Palacios*, 829 F. Supp. 229, 235–36 (N.D. Ill. 1993)).

In short, these cases are based on a different understanding of the favorable termination requirement than we endorsed in *Wilkins*. *Wilkins* adopted the

traditional common law element that a dismissal must "indicate the innocence of the accused" to qualify as a favorable termination. *Wilkins*, 528 F.3d at 803 (quoting Restatement (Second) of Torts § 660 cmt. a (1977)). But in *Smith-Hunter*, the New York Court of Appeals rejected the traditional rule, holding that any dismissal that is "*not inconsistent*" with innocence qualifies as "favorable." 734 N.E.2d at 755 (emphasis added). Not only is *Smith-Hunter*'s conception of the favorable termination requirement at odds with the rule we adopted in *Wilkins*, it flips the traditional rule on its head by presuming terminations are favorable until proven otherwise. As a result, both *Smith-Hunter* and the Second Circuit's *Rogers* decision, 303 F.3d at 160 (applying *Smith-Hunter* and holding that a speedy trial dismissal is a favorable termination under New York law), are of limited persuasive value.

Applying our indicative-of-innocence rule, many courts have found that an abandonment is not favorable even when the crucial evidence was suppressed on *constitutional* grounds.[2] In all of these instances, it was the defendant's exercise of his constitutional right to exclude certain evidence that led to the dismissal.

_____

[2] *See, e.g.*, *Miller v. Cuccia*, 201 F.3d 431, at *1 (2d Cir. 1999) (unpublished) (lack of probable cause for arrest); *Aleman v. City of Bakersfield*, 2013 WL 3936740, at *12 (E.D. Cal. 2013) (warrantless search); *Morgan v. Ramsey*, 2013 WL 869046, at *7 (N.D. Okla. 2013) (invalid warrant); *Willis v. Mullins*, 809 F. Supp. 2d 1227, 1241 (E.D. Cal. 2011) (warrantless search); *El Ranchito, Inc. v. City of Harvey*, 207 F. Supp. 2d 814, 822–23 (N.D. Ill. 2002) (warrantless search); *Dobiecki*, 829 F. Supp. at 235–36 (*Miranda* violation); *Martinez v. City of Schenectady*, 761 N.E.2d 560, 564 (N.Y. 2001) (invalid warrant).

Courts often find that no favorable termination has occurred despite the exercise of statutory or constitutional rights resulting in the termination of a case.[3] In fact, most courts follow the *Wilkins* approach and look to the circumstances surrounding speedy trial dismissals to determine whether they indicate the innocence of the accused.[4] That Cordova had a statutory right to dismissal under the Speedy Trial Act thus does not set aside his burden of meeting the indicative-of-innocence requirement.

Thus, a plaintiff generally cannot maintain a malicious prosecution action unless his charges were dismissed in a manner indicative of innocence, even when he was entitled to dismissal on statutory or constitutional grounds. Although this

[3] *See, e.g.*, *Rhodes v. Mabus*, 676 F. Supp. 755, 758–59 (S.D. Miss. 1987) (prosecutor improperly communicated with grand jurors); *Bearden v. BellSouth Telecomms., Inc.*, 29 So. 3d 761, 766 (Miss. 2010) (lack of jurisdiction); *Parrish v. Marquis*, 172 S.W.3d 526, 533 (Tenn. 2005) (charges outside statute of limitations); *Palmer Dev. Corp. v. Gordon*, 723 A.2d 881, 884 (Me. 1999) (charges outside statute of limitations); *Brown v. Carr*, 503 A.2d 1241, 1246 (D.C. 1986) (failure to state a claim).

[4] *See, e.g.*, *Schlueter v. S. Energy Homes, Inc.*, 252 F. App'x 7, 10–11 (6th Cir. 2007) (speedy trial dismissal not a favorable termination); *Donahue v. Gavin*, 280 F.3d 371, 384 (3d Cir. 2002) (holding that a *nolle prosequi* does not indicate innocence where "[t]he prosecutor simply reasoned that [the plaintiff] was not likely to receive any additional jail time if convicted in a retrial"); *Brayshaw v. Garrett*, No. 4:10CV272, 2011 WL 971147, at *8–9 (N.D. Fla. Jan. 16, 2011) (speedy trial dismissal); *cf. Rich v. Baldwin*, 479 N.E.2d 361, 364 (Ill. App. Ct. 1985) (finding speedy trial violation constituted favorable termination, but tying holding to "prosecutor's unexcused and unexplained failure to proceed to trial"); *Parrish*, 172 S.W.3d at 533 (action dismissed as outside statute of limitations was not favorably terminated); *Palmer Dev. Corp.*, 723 A.2d at 884 (action dismissed as outside statute of limitations was not favorably terminated).

rule may produce a dilemma for defendants at least in some applications, it is both a standard feature of the tort of malicious prosecution and a reflection of the idea that malicious prosecution actions are disfavored at common law. *See Hernon v. Revere Copper & Brass, Inc.*, 494 F.2d 705, 707 (8th Cir. 1974) ("[T]he general rule is that suits for malicious prosecution are viewed with disfavor and are to be carefully guarded against.").

A speedy trial dismissal, moreover, is unlike the *nolle prosequi* in *Wilkins*, in which the prosecution merely dropped the charges. This action by the prosecution is ambiguous, in that we cannot know the reasons for dropping the charges. Here, by contrast, the state court unambiguously granted a motion to dismiss the charges against Cordova. But this distinction is irrelevant. The question we must ask is whether the dismissal was indicative of innocence. It cannot be the case that all dismissals that result from granted motions are favorable terminations for purposes of malicious prosecution actions. The dismissal here does not indicate Cordova's innocence, so it is not a favorable termination.

The favorable termination requirement thus serves as a useful filtering mechanism, barring actions that have not already demonstrated some likelihood of success. Although the traditional requirement may bar some meritorious actions, where prosecutorial delay *does* indicate the innocence of the accused the plaintiff will not be barred from bringing his malicious prosecution claim under our rule.

-13-

Our conclusion is thus more receptive to Cordova's fairness concerns than many applications in this area of the law traditionally are—a dismissal due to a lack of jurisdiction or of admissible evidence will rarely reflect on the merits of the case and is therefore more likely to bar a meritorious claim. Nor, we should emphasize, does a dismissal of charges create a presumption of innocence or shift the burden of proving the element of favorable termination to the defendant.

In sum, we agree with the district court that the dismissal of the underlying assault charges under New Mexico's Speedy Trial Act was not indicative of Cordova's innocence. The undisputed facts reveal the prosecution did not abandon its effort to try Cordova, and nothing suggests the speedy trial dismissal indicated his innocence of the charged crime. Absent such a showing, the district court properly granted summary judgment on the malicious prosecution claim.

### B. *Familial Association*

Cordova next challenges the district court's dismissal of his familial association claim. The court found Cordova had not pointed to any facts that would allow a reasonable jury to conclude the officers intended to interfere with a protected relationship.

"Th[e] right to familial association is grounded in the Fourteenth Amendment's Due Process Clause." *Lowery v. Cty. of Riley*, 522 F.3d 1086, 1092 (10th Cir. 2008). To prevail on a familial-association claim, a plaintiff must make two showings: (1) that the defendants "intended to deprive [him] of [his]

protected relationship," and (2) that balancing the individual's interest in the protected familial relationship against the state's interests in its actions, defendants either "unduly burdened plaintiff['s] protected relationship, or effected an unwarranted intrusion into that relationship." *Thomas v. Kaven*, 765 F.3d 1183, 1196 (10th Cir. 2014) (citations and internal quotation marks omitted). But "not every statement or act that results in an interference with the right of familial association is actionable. The conduct or statement must be *directed at the familial relationship* with knowledge that the statements or conduct will adversely affect that relationship." *Id.* (quoting *J.B. v. Washington Cty.*, 127 F.3d 919, 927 (10th Cir. 1997)) (emphasis added). Put differently, to satisfy the first prong of the test, a plaintiff must allege the defendants had the "intent to interfere" with a particular protected relationship. *Id.*; *see also Trujillo v. Bd. of Cty. Comm'rs*, 768 F.2d 1186, 1190 (10th Cir. 1985).[5] In conducting the balancing required by the second prong, "the court will consider, among other things, the severity of the

---

[5] The officers contend we should analyze Cordova's familial-association claim similarly to our cases addressing pretrial detention, relying on *Bell v. Wolfish*, 441 U.S. 520 (1979). In *Bell*, a group of pretrial detainees argued that visitation restrictions violated their Fifth Amendment right to be free of punishment absent an adjudication of guilt. *Id.* at 530. The Court rejected their claim, holding that a restriction on a pretrial detainee does not constitute punishment unless it is (1) intended as punishment or (2) unrelated to a legitimate government objective. *Id.* at 538. Because *Bell* dealt with a different constitutional claim—the right to be free from punishment—we instead apply our normal familial-association analysis.

infringement on the protected relationship, the need for defendants' conduct, and possible alternative courses of action." *Thomas*, 765 F.3d at 1196.

The district court granted summary judgment in favor of the officers, finding the familial-association claim was barred by qualified immunity. "[Q]ualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation omitted). "When a defendant asserts qualified immunity at the summary judgment stage, the burden shifts to the plaintiff, who must clear two hurdles to defeat the defendant's motion." *Lundstrom v. Romero*, 616 F.3d 1108, 1118 (10th Cir. 2010). The plaintiff must then demonstrate that "(1) the defendant violated a constitutional right, and (2) the right was clearly established at the time of the alleged unlawful activity." *Id.*

We agree with the district court that Cordova cannot meet either prong of the deprivation of familial-association test, and thus cannot show a violation of his constitutional rights. After the shooting, Cordova was taken in for emergency surgery, stabilized, and eventually transferred to a room. At that point, officers barred visitors from his hospital room until he was able to speak with police. Five days later, investigators were informed that Cordova was able to communicate and they attempted to obtain a statement. But at that time he asked

-16-

to speak with an attorney. The officers immediately terminated the interview and the visitation restriction was lifted. The magistrate judge ultimately granted summary judgment on Cordova's familial-association claim, finding that he could not demonstrate the officers intended to interfere with a protected relationship.

Cordova has not presented any evidence demonstrating that the officers intended to interfere with his right to familial association. *See Thomas*, 765 F.3d at 1196. The visitation restriction was not aimed at any particular protected relationship or set of relationships—this was a temporary blanket prohibition on all visitors. Cordova argues that intent to interfere can be inferred from the lack of any legitimate government interest in barring visitors from his hospital room.

The officers claim two legitimate government objectives in response. First, they argue the visitation restriction helped ensure that Cordova's eventual statement was "uncontaminated by the thoughts and views of others." Aple. Br. at 22. Second, they contend the restriction advanced the safety of officers and hospital personnel immediately following the shooting. Cordova argues these justifications are pretextual.

We disagree that he raises a genuine issue of material fact as to the officers' intent. As mentioned above, the argument is that a jury could infer intent to interfere with his relationships from the lack of legitimate reasons for barring visitors from his room. The government, however, did have a legitimate interest in the restriction: it was attempting to obtain an untainted or uninfluenced

-17-

statement concerning the shooting.[6]  At this point, Cordova was being detained for the aggravated assault of three police officers.  Obtaining an unbiased statement could substantially assist in the investigation of the case.  Regardless of whether this justification is sufficient to satisfy the balancing test required under the second prong of the inquiry, this explanation shows the defendants' actions were not directed "at the familial relationship."  *Thomas*, 765 F.3d at 1195–96.  Rather, their actions were directed at obtaining the best statement possible from Cordova.

Nor has Cordova proffered any facts or theories that would allow a jury to find this justification was pretextual.  He argues detectives could not have been very concerned with getting uncontaminated statements because the officers involved in the shooting did not have similar restrictions placed on them.  We fail to see the relevance of this point.  Again, Cordova was in police custody for the aggravated assault of three police officers, a crime for which he would eventually be charged.  Detectives' treatment of the officers in no way relates to the state's interest in obtaining an uncontaminated statement from Cordova.  *Cf. Bell*, 441 U.S. at 546 (finding pretrial detainee "simply does not possess the full range of freedoms of an unincarcerated individual").  Furthermore, the undisputed facts in the summary judgment record support the notion that the point of the visitor

---

[6] Because we agree with the government's first purported interest, we need not address the relationship between the prohibition on visitors and its interest in insuring the safety of officers and hospital personnel.

restriction was to ensure a clean statement. It is uncontroverted that detectives attempted to obtain a statement from Cordova as soon as he was able to communicate. When he declined, the visitation restriction was immediately lifted, showing that the restriction had not been "directed at" interfering with Cordova's familial-association rights, but rather at a legitimate investigative purpose.

We therefore find no error in the district court's dismissal of the familial-association claim. Because Cordova could not demonstrate a constitutional violation, the officers were entitled to qualified immunity on this claim.

### C. Right to a Preliminary Hearing

Cordova next argues the officers failed to timely return the arrest warrant to the state court as required by state law. He contends this delay amounted to a violation of his right to due process. The district court granted summary judgment in favor of the officers, concluding that any delay did not infringe on his procedural due process rights.

In assessing due process claims, our cases require us to ask two questions: "(1) whether the plaintiff has shown the deprivation of an interest in 'life, liberty, or property' and (2) whether the procedures followed by the government in depriving the plaintiff of that interest comported with 'due process of law.'" *Elliott v. Martinez*, 675 F.3d 1241, 1244 (10th Cir. 2012). Liberty interests can either arise from the Constitution or be created by state law. *See Hewitt v. Helms*,

459 U.S. 460, 466 (1983). But not all state laws create constitutionally protected liberty interests. We determine which statutes create liberty interests by looking to "the language of the statutes themselves." *Montero v. Meyer*, 13 F.3d 1444, 1448 (10th Cir. 1994). "Stated simply, 'a State creates a protected liberty interest by placing substantive limitations on official discretion.'" *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 462 (1989) (quoting *Olim v. Wakinekona*, 461 U.S. 238, 249 (1983)).

Cordova points to a New Mexico law that requires the police to return arrest warrants to the issuing court immediately after an arrest is completed.[7] He claims one of the officers failed to comply with this requirement, and as a result, the legal process against him was delayed. More specifically, he argues circuit precedent entitles him to a probable-cause hearing within forty-eight hours of arrest and that New Mexico law entitles him to a preliminary hearing within twelve days of arrest. Because he received no hearings until twenty days after the

---

[7] Section 31-1-4 of the New Mexico Statutes provides in part:

> D. It shall be the duty of the clerk of the district court to issue process in criminal cases filed in the district court. It shall be the duty of the clerk of the magistrate court or the magistrate, if there is no clerk, to issue process in criminal cases filed in the magistrate court. It shall be the duty of the law enforcement officer to whom process is directed to execute process and return the same to the clerk of the court from which process is issued or, if there is no clerk of the court, to the judge thereof.

shooting, Cordova argues that the officer's failure to return the warrant deprived him of constitutionally required timely legal process.

We find no merit in these contentions. Cordova relies on our recent precedent that an arrestee has a right to a probable-cause hearing within forty-eight hours of arrest. *Wilson v. Montano*, 715 F.3d 847 (10th Cir. 2013). But that case establishes no such requirement. As the Supreme Court made clear in *Gerstein v. Pugh*, 420 U.S. 103, 120 (1975), an arrestee has a constitutional right to a prompt probable cause *determination*, not to any particular kind of adversary hearing. Probable cause "can be determined reliably without an adversary hearing" and that standard, reason to believe the suspect has committed a crime, "traditionally has been decided by a magistrate in a nonadversary proceeding on hearsay and written testimony, and the Court has approved these informal modes of proof." *Id.* *Wilson* is not to the contrary. At no point did we recognize a right to a hearing, as Cordova argues. Rather, we simply acknowledged the Supreme Court's recognition of the right to a judicial determination of probable cause. *See* 715 F.3d at 852–53 (citing *Cty. of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991); *Gerstein*, 420 U.S. at 114).

Here, a neutral magistrate judge determined there was probable cause to detain Cordova within a day of his arrest and signed a warrant for his arrest. Cordova has made no suggestion that this procedure was in conflict with the Supreme Court's prior cases approving probable cause determinations made "by a

magistrate in a nonadversary proceeding." *Gerstein*, 420 U.S. at 120. Cordova received his probable cause determination, and the Constitution requires nothing else within forty-eight hours of arrest.

We also are unpersuaded by Cordova's contention that New Mexico law creates a liberty interest, constitutionally protected or otherwise, in a preliminary hearing within twelve days of arrest. In short, he argues that Rule 6-202(D) of the New Mexico Rules Annotated requires a preliminary hearing within ten days of the "initial hearing" and, under *Wilson* and *Gerstein*, the initial hearing must be within two days of arrest. He thus concludes that state law establishes a right to a preliminary hearing within twelve days. As discussed above, however, neither *Wilson* nor *Gerstein* require any kind of hearing within two days of arrest—the initial hearing described in Rule 6-202(D) is an entirely different matter. In fact, New Mexico law sets no specific time limit on initial appearances, requiring only that they be held "without unnecessary delay." N.M. Stat. Ann. § 31-1-5(B). This standard allows for considerable discretion and thus cannot be the basis of a constitutionally protected liberty interest. *See Ky. Dep't of Corr.*, 490 U.S. at 461.

Cordova has not identified any constitutionally protected liberty interests which could support his claim that he was deprived of timely legal process. As discussed above, an arrestee is not constitutionally entitled to a probable-cause hearing within forty-eight hours of arrest where a neutral magistrate has already

made a probable cause determination.  Nor does anything in New Mexico law establish a right to a preliminary hearing within twelve days of arrest.  The district court did not err in dismissing this claim.

### D.  Transfer from University of New Mexico Hospital

Cordova's final constitutional claim is that one of the officers violated his due process rights by transferring him from UNMH to a county jail's medical facility after the hospital discharged him.  He bases this on the state court's bond order which contained a handwritten note stating, "D to remain in custody at UNMH-until further notice."  App. at 691.  Cordova contends this created a constitutionally protected liberty interest in his remaining at UNMH.

The officer is entitled to qualified immunity on this claim.  To establish a due process claim, a plaintiff must demonstrate the violation of a clearly established constitutional right.  A right is clearly established "when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  *Clark v. Wilson*, 625 F.3d 686,

690 (10th Cir. 2010) (quoting *Zia Trust Co. ex rel. Causey v. Montoya*, 597 F.3d 1150, 1155 (10th Cir. 2010)).

First, the Supreme Court has never held that a state court custody order can create a constitutionally protected liberty interest in confinement at a particular facility. Even if such a right exists, it was not clearly established at the time of Cordova's transfer. The bond order stated Cordova should remain at UNMH until further notice. It was not the officer who initiated Cordova's removal from UNMH—the discharge order was issued by the hospital itself. The officer, moreover, had a legitimate interest in keeping Cordova in some form of custody based on the charges that had been filed against him.

In sum, Cordova has pointed to no federal case that would have placed the officer on notice that he had to hold Cordova at UNMH, in contravention of the hospital's discharge order. As a result, the district court did not err in granting qualified immunity on this claim.

### E. Trial Errors and Jury Instructions

Cordova also lodges a series of challenges to the district court's evidentiary rulings and jury instructions, which, he argues, together entitle him to a new trial or judgment as a matter of law on his excessive force claims. He claims five errors, which we consider in turn: (1) the district court improperly admitted evidence of events prior to the officers' arrival that was irrelevant to the reasonableness of the decision to use force; (2) counsel for the officers also

(a) improperly introduced comparative negligence principles relating to the use of force; (b) encouraged members of the jury to empathize with the officers; (c) improperly disparaged Cordova's claims and counsel; and (3) the jury instructions were legally erroneous because they failed to inform the jury that an officer's use of force must be directed at an immediate threat and, where feasible, the officer must issue a warning before using deadly force.

### *1. Prior Events*

Cordova first argues the district court improperly allowed so-called "hindsight" evidence—evidence of which the officers could not have been aware of at the time of the shooting and thus could not have affected the reasonableness of their decision to use force. In particular, he objects to the admission of evidence about Cordova's behavior prior to the police encounter.

As an initial matter, it is unclear what evidence the district court improperly allowed. Where a party objects to the admission of a class of evidence on a particular ground (i.e. hearsay or relevance), he must identify the particular evidence at issue to be entitled to appellate review. *See United States v. Thornburgh*, 645 F.3d 1197, 1210 (10th Cir. 2011).

In any event, the district court did not abuse its discretion in admitting evidence of events prior to the shooting. Contextual evidence can be admitted to help explain later events, especially where it might make one version of events more or less likely. *See Boyd v. City and Cty. of San Francisco*, 576 F.3d 938

(9th Cir. 2009). In *Boyd*, for example, the court allowed evidence of the plaintiff's actions and psychological state prior to a police encounter since it made the officer's version of events—that the plaintiff had been the aggressor—more likely. *Id.* at 948–49. Similarly, both sides in this case contested the facts leading up to this shooting. Evidence of Cordova's actions or mental state prior to the shooting could bolster the officers' claim that he acted aggressively when they encountered him and that he raised his gun at them before they fired.

In sum, the district court did not err in admitting evidence of Cordova's actions prior to the shooting.

### 2. *Comparative Negligence*

Cordova next argues the officers improperly introduced irrelevant comparative negligence principles to the jury. "Comparative negligence is not applied in suits for violations of federal constitutional rights." *Quezada v. Cty. of Bernalillo*, 944 F.2d 710, 721 (10th Cir. 1991).

Cordova claims several instances where comparative negligence was improperly introduced. First, one officer testified, backed by an expert witness, that Cordova could have complied with police commands, but failed to do so. He also claims counsel compounded the error by relying on this testimony during closing arguments.

The statements were relevant and admissible. An individual's failure to comply with an officer's commands is relevant to determining the degree of threat posed by that individual. *Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1314 (10th Cir. 1991). The officer testified that he issued several commands to Cordova and that Cordova had the apparent ability to comply. This, in turn, bears on the objective reasonableness of an officer's decision to use deadly force, and was thus relevant to the ultimate issue in the case.

### 3. *Golden Rule*

Cordova argues defense counsel improperly encouraged jurors to empathize with the officers by asking them to place themselves in the officers' shoes at the time of the shooting. It is well established that a party may not exhort the jury to "place itself in a party's shoes with respect to damages." *Shultz v. Rice*, 809 F.2d 643, 651–52 (10th Cir. 1986). But this so-called Golden Rule argument "is not improper when urged on the issue of ultimate liability," *id.* (quoting *Stokes v. Delcambre*, 710 F.2d 1120, 1128 (5th Cir. 1983)), especially where the issue is the objective reasonableness of the use of deadly force, *see Sherrod v. Berry*, 856 F.2d 802, 804–05 (7th Cir. 1988) ("When a jury measures the objective reasonableness of an officer's action, it must stand in his shoes and judge the reasonableness of his actions based upon the information he possessed . . . .").

### 4. Disparagement of Counsel and Claim

Next, Cordova argues that defense counsel made an improper appeal to emotion in closing arguments. He contends the defense counsel implied to the jury that a verdict for Cordova would promote other lawsuits against officers who have to make deadly force decisions, and that plaintiff's counsel did not have a good faith belief in some of the claims made to the jury.

These arguments are waived. Cordova did not object to the closing arguments at trial and does not argue for plain error review on appeal. *See Richison v. Ernest Group, Inc.*, 634 F.3d 1123, 1131 (10th Cir. 2011).

### 5. Jury Instructions

Finally, Cordova challenges one aspect of the jury instructions. The district court's instructions required Cordova to establish that the officers did not provide an adequate warning before deploying deadly force. The court instructed the jury that an officer's command to "drop the weapon" is a sufficient warning in a situation where events are unfolding quickly. Cordova contends this instruction inadequately represents the proper legal standard.

"[J]ury instructions [are reviewed] as a whole and view[ed] in the context of the entire trial to determine if they 'accurately state the governing law and provide the jury with an accurate understanding of the relevant legal standards and factual issues in the case.'" *United States v. Bedford*, 536 F.3d 1148, 1152 (10th Cir. 2008) (quoting *United States v. Crockett*, 435 F.3d 1305, 1314 (10th

Cir. 2006)). We review the district court's decision to give or to refuse a particular jury instruction for abuse of discretion. *Id.*

Where feasible, an officer is required to warn a suspect that he is going to shoot before doing so. *See Garner*, 471 U.S. at 11–12. The district court did not abuse its discretion or misstate the law in instructing the jury that a command to "drop the weapon" is a sufficient warning where events are unfolding quickly. The testimony at trial showed that one of the officers ordered Cordova to "drop the gun" before firing. Aple. App. at 27. This was a sufficient warning, given that events were unfolding quickly and Cordova posed an active threat to the officers throughout the encounter. *See Samuel v. City of Broken Arrow*, 506 F. App'x 751, 754 (10th Cir. 2012) (noting this court has "treated orders to drop a weapon . . . as sufficient warning when events were unfolding extremely quickly").

Cordova also contends that an instruction stating that officers may use force if "there was a threat of serious physical harm" was deficient for not limiting the use of force to *immediate* threats of serious physical harm. Reading the instructions as a whole, however, makes it clear that the jury was given an accurate explanation of the law. That same instruction told jurors to consider "whether the suspect posed an immediate threat" and whether he made any "hostile motions" towards the officers. App. at 1179. The instruction also said that a warning was required before shooting, when possible, and that an "order to

-29-

drop a weapon is sufficient in cases where events are unfolding extremely quickly." *Id.* Taken in context, the instruction clearly focuses the jury on the necessity of an immediate threat. We therefore find no error in the wording of this instruction.

* * *

In sum, we reject each of Cordova's alleged errors and agree with the district court's decisions denying his motion for judgment as a matter of law and his motion for a new trial.

## III. Conclusion

For the reasons set forth above, the district court is AFFIRMED.

No. 14-2083, *Cordova v. City of Albuquerque, et al.*

**GORSUCH**, Circuit Judge, concurring in the judgment.


The plaintiff seeks damages first and foremost because, he says, local law enforcement officials violated his Fourth or maybe his Fourteenth Amendment rights (we're never told which) by committing the common law tort of malicious prosecution. The defendants accept the premise that the Constitution somewhere (they too never say where) contains something resembling a malicious prosecution tort. Both sides even agree that proof of a "favorable termination" is an essential element of their constitutionalized tort and they disagree only over how favorable that termination must be. The plaintiff argues that a procedural victory should suffice while the defendants contend that any termination must speak more clearly to the plaintiff's innocence.

Respectfully, I would decline the parties' invitation to their fight. We are not in the business of expounding a common law of torts. Ours is the job of interpreting the Constitution. And that document isn't some inkblot on which litigants may project their hopes and dreams for a new and perfected tort law, but a carefully drafted text judges are charged with applying according to its original public meaning. If a party wishes to claim a constitutional right, it is incumbent on him to tell us where it lies, not to assume or stipulate with the other side that it must be in there *someplace*.

To be sure, the parties are not the only ones to blame here. The question of malicious prosecution and its place (or not) in the Constitution is "one on which there is an embarrassing diversity of judicial opinion." *Albright v. Oliver*, 510 U.S. 266, 270 n.4 (1994) (plurality opinion) (internal quotation marks omitted). One on which this "circuit has not always written consistently." *Taylor v. Meacham*, 82 F.3d 1556, 1561 (10th Cir. 1996). And one the Supreme Court has only recently agreed to revisit. *Manuel v. City of Joliet*, 590 F. App'x 641 (7th Cir. 2015), *cert. granted*, No. 14-9496, 2016 WL 205942 (U.S. Jan. 15, 2016). So the fact the parties tiptoe gingerly around the subject is hardly surprising. Indeed, I respectfully suggest that any effort to enter the arena and consider the question carefully is likely to leave you looking for the exits.

Consider the alternatives most frequently offered as contenders, the Fourth and Fourteenth Amendments. In *Albright*, the opinions were various and varied but at least seven justices of the Supreme Court seemed to agree that the "substantive" component of the Fourteenth Amendment's due process clause contains nothing like this tort. *See* 510 U.S. at 271-75 (plurality opinion); *id.* at 281-83 (Kennedy, J., concurring in the judgment); *id.* at 286 (Souter, J., concurring in the judgment). Of course, this much might leave you wondering if the "procedural" component of the due process guarantee remains a potential candidate after *Albright*. But it's long since settled that even when a state deprives a person of life, liberty, or property, it does not violate an individual's

-2-

procedural due process rights so long as it provides an adequate remedy for the deprivation. *See Hudson v. Palmer*, 468 U.S. 517, 533 (1984); *Parratt v. Taylor*, 451 U.S. 527, 543-44 (1981); *Ingraham v. Wright*, 430 U.S. 651, 683 (1977). And there's no question in our case that state tort law provides adequate remedies to resolve the plaintiff's complaint. Indeed, we know that New Mexico enjoys a rich common law, one that provides a well-defined tort against the "malicious abuse of process." We even know that under the terms of New Mexico tort law it's settled that a plaintiff doesn't need to prove any kind of favorable termination at all. *See DeVaney v. Thriftway Mktg. Corp.*, 953 P.2d 277, 286 (N.M. 1997), *overruled in part by Durham v. Guest*, 204 P.3d 19 (N.M. 2009). Given all this, there's just no reason to think a plaintiff might possibly be "due" any more process than the State of New Mexico already provides. *See Albright*, 510 U.S. at 283-85 (Kennedy, J., concurring in the judgment).

That leaves the Fourth Amendment. Here the story is longer but there's strong reason to suspect it ends the same way. The plurality in *Albright* expressly left open the possibility that the Fourth Amendment might provide a home for something like a tort of malicious prosecution. 510 U.S. at 275. But the Amendment as originally understood focused on restraining police action before the invocation of judicial processes. *See* Thomas Y. Davies, *Recovering the Original Fourth Amendment*, 98 Mich. L. Rev. 547, 609-11 (1999). And textually the relevant language of the Amendment speaks to "unreasonable searches and

seizures." Meanwhile, the tort of malicious prosecution has traditionally concerned itself not with police practices — with searches or restraints on physical liberty before the invocation of judicial proceedings — but with the misuse of judicial proceedings. Indeed, many plaintiffs claiming malicious prosecution (including the plaintiff here) seek damages for a defendant's wrongful use of legal processes even many years after any search or seizure and while the plaintiff remains at liberty awaiting trial. So it's just pretty hard to see how you might squeeze anything that looks quite like the common law tort of malicious prosecution into the Fourth Amendment. *See* Lyle Kossis, Note, *Malicious Prosecution Claims in Section 1983 Lawsuits*, 99 Va. L. Rev. 1635, 1650-52 (2013).

The only apparent way around this problem appears to invite more problems of its own. While the tort of malicious prosecution focuses on the misuse of judicial proceedings, some have suggested the Fourth Amendment might too because a criminal defendant remains "seized" for Fourth Amendment purposes not just during the pendency of his arrest but throughout the life of a criminal prosecution — even while he is at liberty on bond awaiting trial. *See, e.g.*, *Albright*, 510 U.S. at 277-79 (Ginsburg, J., concurring). But in light of the Amendment's history and text, we've long conceived of seizures as intentional and effectual restraints on liberty that suffice to lead "a reasonable person . . . to conclude that he is not free to 'leave.'" *Michigan v. Chesternut*, 486 U.S. 567,

-4-

573 (1988). If we were to amend this understanding at this late date, so that someone free to leave on bond remains "seized" all the same, what about the defendant awaiting trial on his own recognizance? Or someone served only with a petty citation or summons to appear at trial? And what about the victim of maliciously employed civil process? Or the witness served with a subpoena compelling his appearance? No less than the bonded defendant, all these persons are subject to a seizure if they fail to appear at trial. Yet we've never considered any of them "seized" simply by virtue of a *conditional* threat of a seizure. To do so now would seem (again) to require us to cast a blind eye to the historical (police action) concerns of the Fourth Amendment and the ordinary meaning of its terms. *See* Kossis, *supra*, at 1649-52. Indeed, for reasons like these, several courts of appeals (this one included) have already rejected the continuing seizure theory. *See, e.g.*, *Becker v. Kroll*, 494 F.3d 904, 915-16 (10th Cir. 2007) (collecting cases). And I would have thought that enough to resolve this case. For even if we overlook the parties' failure to identify a constitutional home for their putative cause of action, our own precedent would appear to preclude either of the obvious (Fourth or Fourteenth Amendment) alternatives they might pursue.

You would have to wonder, too, if bending the history and language of the Fourth Amendment in new and procrustean ways to embrace a malicious prosecution tort might invite some unintended consequences. What would a Fourth Amendment right look like when expanded to parties and witnesses at

liberty awaiting trial?  Might every trial subpoena contest now assume

constitutional dimension — and if not, why not?  Might expanding the

Amendment's reach at least marginally disincentivize the use of liberty-

protecting, pre-trial citation processes previously thought sufficient to avoid the

Amendment's application?  *See Martinez v. Carr*, 479 F.3d 1292, 1297 (10th Cir.

2007).  And how might this new understanding of the Fourth Amendment be

squared with existing Supreme Court jurisprudence, which has traditionally

treated the post-arraignment, pre-trial detention process as the province of the

Fifth and Fourteenth — and not the Fourth — Amendment?  *See, e.g.*, *United

States v. Salerno*, 481 U.S. 739, 746-47 (1987).

Neither is that the end to the nettles lining the Fourth Amendment path.

Anyone wanting to claim a place in the Fourth Amendment for something like a

malicious prosecution tort would, of course, have to decide its elements.  And that

task would surely invite disagreement among the circuits and tension with state

law.  Indeed, it's far from obvious that a Fourth Amendment-based cause of

action would wind up looking anything like a common law claim for malicious

prosecution, for the tort traditionally has required proof of malice (while the

Fourth Amendment has historically been thought to involve objective

"reasonableness" tests) and the institution of legal proceedings (something the

Amendment has never demanded before a violation is found).  *See generally*

Kossis, *supra*, at 1649-50.

These are, as well, hardly the only themes on which we might expect variations and disputes. Our case offers one more example among what are sure to be many. The defendants contend for a rule requiring the plaintiff to prove not just that a prior criminal action against him was terminated in his favor, but that it was terminated in a way suggesting his innocence on the merits. The court today adopts that standard and claims to do so as a matter of constitutional imperative. But no one has directed us to any other circuit to have gone so far as a matter of constitutional law. Meanwhile, many states do not require so much as a matter of common law, holding that terminations won on procedural grounds, like the speedy trial dismissal in this case, suffice. *See, e.g.*, *Murphy v. Lynn*, 118 F.3d 938, 950 (2d Cir. 1997); *Rich v. Baldwin*, 479 N.E.2d 361, 363-64 (Ill. App. Ct. 1985); *Gumm v. Heider*, 348 P.2d 455, 464-65 (Or. 1960). Still other states have concluded that speedy trial dismissals may be procedural but *do* reflect the merits — and reflect them in the plaintiff's favor. *See, e.g.*, *Miller v. Watkins*, 653 P.2d 126, 130 (Mont. 1982). In fact and as we've seen, the very state in which the actions at issue in this case took place (New Mexico) requires no proof of favorable termination at all. And if (as might be hoped) we take seriously the idea that we are expounding the Fourth Amendment's original public meaning, anyone claiming a malicious prosecution tort can be found in the Amendment might at least want to cast a curious eye to the elements of the cause of action as they existed at the time the Amendment was adopted — yet it's something no one

has attempted here and something that would not (at least at a glance unaided by any briefing) seem to support the court's decision today.[*]

If all these brambles lining the Fourth Amendment path don't leave you doubting the wisdom of venturing that way, perhaps they at least leave you wondering about the necessity of the attempt. After all, out of respect for considerations of judicial modesty, efficiency, federalism, and comity, the Supreme Court in procedural due process cases generally encourages federal courts to abstain in favor of state common law remedial processes rather than try to recreate them in the name of the Constitution. And it's pretty hard to see why we should ignore those same considerations and that same option simply because someone might claim something like the malicious prosecution tort might find a home in the Fourth rather than the Fourteenth Amendment. Carefully devised,

---

[*] From what I can tell after a brief and lonely look, the "indicative of innocence" gloss proffered by the defendant is just that, a possibility alluded to by some common law courts and appearing in a comment to the Restatement of Torts — but not a requirement appearing in the Restatement's actual text and not a firm and settled requirement in anything like all common law jurisdictions at the time of the Amendment's adoption — let alone now. *See* Martin L. Newell, A Treatise on the Law of Malicious Prosecution and the Abuse of the Legal Process 327 (1892) ("[J]ust what is a legal termination of the prosecution and sufficient to maintain the action . . . does not appear to have been so completely settled."); *see also Clark v. Cleveland*, 6 Hill 344, 345-47 (N.Y. Sup. Ct. 1844). Neither is the necessity of this gloss entirely apparent if the plaintiff already has to prove (as he does under most every articulation of the tort's common law elements) that the criminal proceedings against him were the product of malice and instituted without probable cause. *See* Newell, *supra*, at 343 (discussing the common law's "better and more equitable rule").

tested, and often pretty ancient state tort law is readily available to address the plaintiff's claimed injury in this case. Neither can it come as a surprise that existing state common law courts will usually supply a sound and sufficient remedy when claims (possibly) of constitutional dimension are at stake: the whole point of the common law as it evolved in England and this country through the centuries was to vindicate the rights thought fundamental to the enjoyment of life, liberty, and property. Before barreling down the constitutional road, why not at least pause to consider the possibility of abstaining in favor of common law proceedings? Asking first: is there really a need to decide any matter of constitutional gravity or might the common law already supply whatever remedy the parties seek to project onto the Constitution? To be sure, *Parratt* abstention doctrine is often said to have originated in the procedural due process setting (though there's good reason to question that account, *see Browder v. City of Albuquerque*, 787 F.3d 1076, 1085 (10th Cir. 2015) (Gorsuch, J., concurring)). But even accepting the premise I cannot think of a good reason why the doctrine should be limited to that or any particular class of cases — why abstention should turn on the question which amendment the plaintiff might happen to invoke (or hope we might invoke) as the source of his right rather than on the question whether state law is adequate to vindicate the injury he alleges — as it indisputably is here. *See generally Albright*, 510 U.S. at 283-86 (Kennedy, J., concurring in the judgment); *Browder*, 787 F.3d at 1084-85 (Gorsuch, J.,

concurring); *Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 195 (1985); *Newsome v. McCabe*, 256 F.3d 747, 750-51 (7th Cir. 2001); *Schaper v. City of Huntsville*, 813 F.2d 709, 718 (5th Cir. 1987); *Mann v. City of Tucson, Dep't of Police*, 782 F.2d 790, 797-98 (9th Cir. 1986) (Sneed, J., concurring in the result).

The objections to abstention are familiar but unpersuasive. Some have argued that § 1983 authorizes federal courts to remedy constitutional injuries so federal courts must decide any claim brought under its auspices. *See, e.g.*, *Albright*, 510 U.S. at 315-16 (Stevens, J., dissenting). Some have also seemed to suggest that state courts cannot be trusted to apply their own common law fairly to their own citizens in suits against state officials. *See* Kossis, *supra*, at 1661 & n.161. But, respectfully, it's long since settled that the statutory power to proceed does not always entail the duty to do so, for federal courts not infrequently abstain when they have the power to decide. *See, e.g.*, *Younger v. Harris*, 401 U.S. 37, 43-44 (1971); *Parratt*, 451 U.S. at 540-44; *Browder*, 787 F.3d at 1083-84 (Gorsuch, J., concurring). And even if there may be some circumstances when federal courts have to act because state courts are unable or unwilling to intervene, no one suggests anything like that in this case or in the mine run of cases like it. To the contrary, every indication in this case is that the plaintiff would have fared much better under state tort law than he does under our constitutionalized facsimile of state tort law — and it is surely at least a little

-10-

ironic that in the name of protecting individual rights we not infrequently wind up in cases like this one effectively diminishing them. *See Albright*, 510 U.S. at 285-86 (Kennedy, J., concurring in the judgment); *Browder*, 787 F.3d at 1084 (Gorsuch, J., concurring).

In the end, all the difficulties and doubts associated with finding a home for a tort of malicious prosecution in the Constitution confirm for me the obvious: that "some questions of . . . tort law are best resolved by" tort law. *Albright*, 510 U.S. at 284 (Kennedy, J., concurring in the judgment). When the parties cannot be bothered to identify the source of their supposedly constitutional complaint, when the avenues to a constitutional home are lined with doubt, and when there's a perfectly free and clear common law route available to remedy any wrong alleged in this case, I just do not see the case for entering a fight over an element of a putative constitutional cause of action that may not exist and no one before us needs. Often judges judge best when they judge least — and, respectfully, I believe this is such a case.